A. D. Graham & Company, Inc., Appellant, *v.*
Pennsylvania Turnpike Commission.

Argued March 24, 1943. Before MAXEY, C. J.; DREW,
STERN, PATTERSON, PARKER and STEARNE, JJ.

reargument refused August 12, 1943.

*Ernest O. Kooser,* with him *James O. Courtney,* for appellant.

*Charles F. Uhl,* with him *John D. Faller, Harry C. Pepper* and *N. L. Wymard,* Deputy Attorney General, and *James H. Duff,* Attorney General, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, June 30, 1943:

This is an appeal from an order of the court below awarding a new trial in a condemnation proceeding, in which the plaintiff, A. D. Graham and Company, Inc., is seeking to recover damages alleged to have been sustained by reason of the location and construction of the Pennsylvania turnpike over a strip of ground plaintiff claimed to have owned. The case was tried twice. At the first trial the jurors returned a verdict in favor of the plaintiff in the sum of $200 as damages on the Carrie Weller tract (a tract not involved in the second trial) and also found "the plaintiff does not have title to Folk, Griedline or Glessner tracts." (The last tract was also not involved in the second trial.) At the last trial the jury awarded the plaintiff $50,000 as damages. The defendant moved for a new trial assigning several reasons, which were all dismissed except the one relating "to the admission of incompetent testimony under the measure

of damages". This was sustained and a new trial awarded, as it should have been. Plaintiff appealed.

Defendant also assigned reasons for a new trial in the court below, and has stated that "the court below is going to be confronted with these same questions that have been before it in the two preceding trials" and has asked us to "indicate the applicable law to be followed in a new trial—particularly because of the importance of the questions involved and the time and effort that will be saved in cases involving the same legal principles in which the appellee is concerned." At bar plaintiff-appellant also expressed a desire that this should be done. We will do this.[1]

The basic question was the ownership of the right-of-way. Both parties claim title to the land from a common source, to wit, The South Pennsylvania Railroad Company. (Hereinafter referred to as the South Penn Company.) The plaintiff proved title in fee in this Railroad Company by offering the various deeds from the original land owners. Plaintiff then traced its chain of title through tax sales and by adverse possession. To prove its tax title, plaintiff, for the purpose of showing that this right-of-way was in fact *unseated* land, showed that the South Penn Company discontinued the construction of its railroad on it, that after working on the excavation and grading of this strip for about two and one-half years, it left partially completed cuts, fills, stone culverts and tunnels; "laid no track;" and "no car was ever run on it." Plaintiff also showed that the South Penn Company left no personal property, or building or other improvements on this land.

This evidence was followed by the capital stock reports of the South Penn Company filed at Harrisburg for the years 1885 to 1891, inclusive, and similar reports for the South Pennsylvania Rail*way* Company, (hereinafter referred to as the S. P. Railway Co.). This Com-

---

[1] We have examined all of the Record testimony, including the numerous photographs, maps, photostatic copies of public records filed in the Capitol and all the other exhibits.

pany bought all the assets of the South Penn Company in a judicial sale in proceedings in the State Court, subject, however, to the mortgage from the South Penn Co., to the Union Trust Company. For the years 1891 to 1894, inclusive, the ledger sheets at Harrisburg show the payment or non-payment of the taxes by the South Penn Company and of the S. P. Railway Company, some containing markings on the South Penn Company sheets that "This Company is defunct"—"No Value, This Company is defunct", and a notation "abandoned—defunct" —marked "by order of John A. Glenn, November 19, 1896", on the S. P. Railway Company's reports. The notation beneath the last: "July 29, 1904, this company was sold at judicial sale May 14, 1904, to form the Fulton, Bedford & Somerset R. R. Company. See papers on file." There were offered in evidence letters from Lyman D. Gilbert, President of the S. P. Railway Company to the Auditor General and Attorney General offering compromises of its claim of the Commonwealth against it, all the tax records including capital stock reports and ledger sheets that were in the department for the Fulton, Bedford & Somerset Railroad Company (hereinafter referred to as the Fulton Company) for the years 1904 to 1939, inclusive. The legal purpose of this offer was "to show that the . . . South Pennsylvania Railroad Company and the South Pennsylvania Railway Company . . . was out of operation and defunct from 1890 on," and therefore that this unseated land was legally subject to local assessment for taxes.

The plaintiff then offered in evidence the assessment record from the County Commissioners' office of Somerset County. The assessment records for Somerset Township for 1892 and 1893, and for Lincoln Township for 1892, 1893, 1894 and 1895 showed the assessment of the several parcels of land comprising the right-of-way against the South Penn Company and against the original owners, and "the acres are identical." The County Treasurer's return taxes for 1892 and 1893 were offered but objected to until proof was made of the certificate

from the County Commissioners to the County Treasurer's record of return of taxes, entitled "Unseated Land Record, Volume 3," made to the treasurer of Somerset County, as provided by the Act of Assembly of April 30, 1879, showing the sale of these parcels of land to the County Commissioners on June 11, 1894. This was again objected to until the certificate from the Commissioners to the Treasurer required by law was first produced. Evidence was then offered that the certificate could not be found, and the objection was overruled. This record was followed by County Commissioners' "Unseated Land Book Vol. 1," which is a record of purchases from the County Treasurer, and "a notation showing the disposition"; and the County Commissioners' Sales Records showing the sales of the parcels of land here involved to the purchasers under whom the plaintiff claims title by subsequent conveyance. The minute book of the County Commissioners showing the fixing of the county tax rate for 1891 and 1892 was offered and was followed by the records showing the acknowledgment of the deeds by the County Treasurer in open court on September 26, 1894, as filed in the office of the Prothonotary. The advertisements of both Treasurer's and the County Commissioners' sales were offered and admitted over the objection of the defendant. All this record evidence was admitted over the repeated objections of counsel for the Commission. Then followed the evidence that the purchasers from the County Commissioners by deed conveyed the land constituting the rights-of-way to the Pittsburgh, Westmoreland and Somerset Railroad Company (hereinafter referred to as the Somerset Company) in 1905, when this company was granted a charter by the Commonwealth to construct and operate a railroad from Somerset to Ligonier in Westmoreland County. The Somerset Company proceeded to construct and operate its railroad from July 25, 1905, as shown by the advertisement of the Somerset Herald announcing train service, two trains daily each way from Somerset to Ligonier, and Latrobe and Pittsburgh. This serv-

ice continued until 1915 when the operation was discontinued. In the meantime on July 7, 1905, the Somerset Company gave a mortgage to the New York Trust Company securing a bond issue of $700,000 covering its railroad and such property as was owned by it. The New York Trust Company assigned the mortgage to the Northern Central Trust Company in June 1919. By equity proceedings in Somerset County the Trust Company foreclosed the mortgage, and in 1920 the property and franchises were sold to a Bondholders' First Mortgage Protection Committee, which in turn in 1925 by deed conveyed the property to A. D. Graham & Company, the plaintiff.

Evidence of the continuous possession of all of the said roadbed in controversy since 1894 "except the Moses Friedline alias Frank B. and Leona Miller, part A; and of said Friedline alias Miller strip since 1904 or earlier" was introduced by the plaintiff to also prove that it and its predecessors in title have had open, continuous and adverse possession "except as (it) may be affected for five years from the 24th of October 1906 by said agreement between the Fulton and Somerset Companies."

The Friedline or Miller tract was never sold for taxes, but the plaintiff attempted to prove title to this tract by a deed dated November 11, 1905, to the Somerset Company from the daughter and son-in-law of Moses Friedline for the right of way that was conveyed by Moses Friedline to the South Penn Company on March 3, 1885. The plaintiff's sole claim of title to this tract is set forth in his statement as follows: "Title in A. D. Graham Company by adverse, continuous and open possession by it and its predecessors in title hereinafter mentioned, since 1905."

Then followed the evidence to prove the amount of the plaintiff's damages for the land condemned and appropriated by the Commission, and the witnesses placed their estimate upon it from the standpoint of adaptability of the strip of ground as a right-of-way for an industrial railroad, railway, a highway, or other public util-

ity right-of-way such as a pole or high tension wire line, gas line, aqueduct or water pipe line. Their competency was challenged and the method of arriving at the market value was also objected to because "they were not familiar with the property, never having seen the property before the appropriation, and were not acquainted with land values in the vicinity . . ." and "their estimates of opinion as to its market value immediately before the appropriation are based almost wholly, if not entirely, upon replacement or reconstruction cost as the basis or method of arriving at market value." These witnesses testified, first, to the fair market value of the entire property from station 305 + 20.17 to station 505 + 30, consisting of 2.14 miles of roadbed. This was the continuous property from the Weller property at Husband westward to the Glessner property. Secondly, to the fair market value of what was designated as Section No. 1, beginning at station 505 + 30, just west of the Carrie Weller property to station 379 + 68.09, the eastern line of the Moses Friedline property, 1.34 miles, which includes the William F. Weller, the Mary Etta Kelley, the Harrison Gohn, Charles Baker and William H. Stahl or William G. Stahl properties. Third, they testified to the fair market value of what was designated as Section No. 2 which was the Moses Friedline strip, extending from station 341 + 77.71 to station 379 + 68.69, a distance of 3/10 of a mile, and lastly, to Section 3 extending from the west line of the Friedline property at station 341 + 77.71 to the eastern line of the Glessner property at station 315 + 20.71 a distance of 5/10 of a mile. The stations and distances were all taken from the "taking plans" that were prepared by the Commission. The foregoing testimony the Court later properly adjudged to be incompetent.

The defendant in addition to challenging the validity of the plaintiff's tax title and its claim of adverse possession, sought to prove ownership of all of the roadbed in controversy by the following testimony: It accepted the deeds to the South Pennsylvania Railroad

Company already put in evidence by the plaintiff. This was followed by offering in evidence, without objection, the mortgage from the South Penn Company to the Union Trust Company of New York, as trustee, covering this railroad's entire lands and property, its corporate rights, privileges and franchise dated January 1, 1885. Then followed the evidence setting forth in detail the proceedings to foreclose the mortgage in 1903 by the Union Trust Company against the South Penn Company and the S. P. Railway Company in the then called Circuit Court of the United States for the Western District of Pennsylvania terminating in the confirmation in June 1904 of the judicial sale of the property covered by the mortgage to Herbert R. Preston and William W. Wood. Soon after, on July 18, 1904, Preston and Wood, by deed, conveyed all the physical property and the corporate rights and franchises of the South Penn Company to the Fulton Company. The Fulton Company's deed of October 21st, 1938, of all of the rights of way of the South Penn Company to the Pennsylvania Turnpike Commission was offered and admitted in evidence without objection. There was also offered in evidence the agreement between the Fulton Company and the Somerset Company, dated October 24, 1906, wherein it was set forth that each of the companies claimed that it was entitled to the sole use of the right-of-way, but, nevertheless, agreed therein on its use without admitting the claim or rights of the other. Defendant also showed that Moses Friedline, one of the original land owners, died testate, leaving only one child, a daughter who was married to Edward H. Miller, and that by Friedline's last will he devised only a life estate to his daughter and that she died in 1936, about three years before the appropriation. Defendant also called a number of witnesses to testify to the fair market value of the strip of ground in controversy immediately before the appropriation. Because of the admission of incompetent testimony as to land values, the court below set aside the verdict of $50,000.

In the interest of bringing this litigation to an end in the next trial we will discuss now *all* the legal questions involved. The court below in its opinion defined the position of the parties as to the measure of damages, saying: "It is conceded that the correct measure of damages, applied in the trial of the case, is the difference between the fair market value of the land appropriated immediately before the appropriation and unaffected thereby, and its fair market value immediately after the appropriation and as affected thereby. All of the witnesses called, both by the plaintiff and the defendant, were in accord in testifying that the land had no value whatever after the appropriation and as affected thereby. This narrowed the question to the fair market value of the land immediately before the appropriation and unaffected thereby."

The plaintiff called five witnesses to testify as to land values. Three of them were consulting engineers and two were real estate experts, and all resided in Pittsburgh. Each of these witnesses testified, under objection, as to the value of the land before and after the appropriation. Two of the consulting engineers testified that they never saw the land prior to the appropriation and not until the turnpike was completed. The third engineer saw parts of it from some of the travelled roads, and from a creek which he fished near the railroad track. He never travelled by train over any portion of it. None of the engineers were acquainted with land values in that vicinity. The only acquaintanceship of these engineers (except "the third engineer" mentioned above) with this strip of land was from the defendant's maps of survey showing profiles, cross-sections and construction work of the unfinished South Penn Company prior to the appropriation by the Commission, which it furnished to the witnesses. From these maps they testified they were able to calculate the amount of excavations of the earth and fills that went into the South Penn roadbed before the turnpike appropriated it, the number of cubic feet of earth taken from the cuts to fills, including borrowed

earth; the number of cubic feet of stone in five stone masonry culverts within the entire strip of land involved, and the lineal feet of tunnel excavation in connection with a tunnel 288 feet in length on the Friedline property. We agree with the court below that ". . . a careful reading of their testimony clearly shows that their estimates of opinion as to its market value immediately before the appropriation are based almost wholly, if not entirely, upon replacement or reconstruction cost as the basis or method of arriving at market value". It is obvious that they determined market value by using reproduction costs at 1939 unit costs less depreciation, one of the witnesses expressly stating that "without that (reproduction cost) I wouldn't know how to arrive at the market value of anything."

In *McSorley v. Avalon Borough School District,* 291 Pa. 252, 139 A. 848, which was an appeal by the School District from an award of damages, a builder, a witness for the plaintiff, testified to the replacement value of the house and garage on plaintiff's property at the time it was taken. This was assigned as error and we said: "No other evidence is as unsatisfactory as that necessarily received in this class of cases. Courts and juries are given by the witnesses matters of opinion only, the accuracy of which is far more difficult to test than are disputed questions of fact. An endeavor to minimize this uncertainty may excuse the error which appears in the ruling now complained of, and in the single case supposed to sustain it, but it is error notwithstanding. Even those who are but slightly conversant with the subject know that where the building being valued is in a neighborhood which has run down, or where it was erected by an owner for his home, or where it is so located on a large lot as to hinder the proper development of the property after the character of the neighborhood has changed, the replacement value of such house will always be greater than the value of the building as part of the property in its entirety; indeed it may be, and sometimes is, in excess of the market value of the prop-

erty, including the building . . . It is clear, therefore, that evidence of the replacement value of plaintiff's buildings should not have been received, unless the circumstances were so peculiar as to render it absolutely essential, in the interest of justice to require its admission. We know of no circumstance which could justify it; certainly none appears on this record." See also *Chatfield v. Board of Rev. of Taxes,* 346 Pa. 159, 163, and cases there cited.

The court below after citing the just mentioned case said: "It may be that the circumstances of the present case are so peculiar as to render it absolutely essential, in the interest of justice, to require the admission of this kind of evidence. That may become a question for the Supreme Court to ultimately decide; but for the purpose of disposing of the motion for a new trial, we are bound to follow the law as declared in the above case." We find here no circumstance requiring that evidence's admission. Plaintiff attempted to show that this abandoned right-of-way had a use for particular purposes, but that there was any market for this property for this purpose does not appear. In *Hall v. D., L. & W. R R.,* 262 Pa. 292, 105 A. 98, a case of eminent domain, a verdict for the plaintiff was set aside on the ground that one witness' testimony was based on the adaptability of the land for building lots, and we said that it ". . . nowhere appeared from his testimony, nor indeed that of any other witness, that there was any market or present demand for such sites, nor were any circumstances shown from which present market or demand could be reasonably inferred . . . Unquestionably in a proceeding such as this it is entirely proper to take into consideration an element of damage anything peculiar to the owner's property that distinguishes it from the other lands in the same neighborhood giving it increased value in the public market before its appropriation. Otherwise the landowner would not be receiving the full compensation for his deprivation which the law intends. If he could convert his land in the general

market at the time of its appropriation by the railroad and receive an enhanced price over and above what his neighbors could receive for theirs lacking the peculiar advantages possessed by his, there is no reason why he should not be correspondingly compensated by the railroad company. And this is equally true where the peculiarity which gives enhanced value to his extends to lands lying in a particular locality, whether owned by one or several. But it is always to be borne in mind that the law does not presume the existence of such peculiarity and the loss on account of its appropriation by the railroad; it always rests upon a party claiming the extraordinary damage first of all to show it, and to show that it was available to him for the purpose of conversion in the public market at the time he was deprived of his land by the railroad company. The mere assertion of any such fact without proof comes to nothing . . ." Evidence of the value of land for a particular purpose is of no avail when there is shown no market for land for *such a purpose*. For example, a certain kind of timber might be useful in the making of bows and arrows but if there was no market for these implements, the timber's value for such use could not be shown. The court below correctly held that the admission of this testimony made a new trial imperative.

Final adjudication of this case rests upon the determination of the title to this land which both parties claim. The Commission commenced the construction of the roadbed for the turnpike, and on November 21, 1939, the plaintiff asked for the appointment of viewers to assess damages for the tract. On December 13, 1939, the Commission filed its petition asking the court to stay the viewers' proceedings averring that there was a substantial dispute as to title to nine tracts of land, which is the property here involved, and also asked the court to withdraw this property from consideration of the viewers until such time as the question of title has been determined in some appropriate proceedings for determining title to lands. The plaintiff's answer asserted

that "the Act of May 21, 1937, P. L 774, furnished a complete method for ascertainment of respondent's title in the premises." Viewers were appointed and from their report both parties appealed. The issue to determine the plaintiff's damages was then framed.

The common source of title is the South Penn Company. The court below in its opinion correctly states that "the plaintiff asserted title to said land (1) by tax title, and (2) by adverse possession." The Commission made a dual challenge to this tax title. First, it avers that the South Penn Company was not subject to local taxation until action had been taken on the part of the Commonwealth and its charter had been forfeited. Second, it avers that the tax title was divested by sale of this property in the foreclosure proceedings in the United States Court by the Union Trust Company against South Penn Co., and S. P. Railroad Company upon the trust mortgage given by the South Penn Co.

It is established in Pennsylvania that the property of a railroad company which is necessary for the exercise of its public franchise is exempt from local taxation: *Railroad v. Berks County,* 6 Pa. 70. However, the question whether the roadbed of a railroad which is necessary for the exercise of the railroad's franchise, has lost its exemption because it was not completed or in operation within ten years of the granting of the franchise has not been so definitely decided. There are many cases which hold, as Mr. Justice SHARSWOOD did in *East Penna. R. Co.'s case,* 1 Walk. 428, that, "The rule which is to be extracted from the authorities on the subject of the liability of railroad companies to taxation for local purposes, is that it is only so much of their property as is *indispensable to the construction* of the road and *fitting it for use* that is exempt. It is not all which they can lawfully take or hold under their charters . . ." (Italics supplied.) See also *Penna. C. & R. Co. v. Vandyke,* 137 Pa. 249, 253, 20 A. 653. The application of this rule by the trial judge to the facts in this case is the basis of the Commission's complaint. The

trial judge in his charge said: ". . . However, if, as it undisputably appears from the evidence in this case, that the South Pennsylvania Railroad Company was never constructed or operated and that all activities for the accomplishment of this object ceased about the year 1885, and was never resumed thereafter; and that since said time this right-of-way has been lying dormant and inactive until acquired by the Pittsburgh, Westmoreland and Somerset Railway Company about 1905, and that the same were not necessary or indispensable to the exercise of its franchise, then we instruct you as a matter of law that rule as stated has no application, and that such rights-of-way were subject to assessments for local taxation purposes, and in default of the payment of the taxes so assessed, were subject to sale for non-payment of taxes . . ." To sustain this part of the charge the court below said: ". . . Certainly it cannot be successfully contended that the property which was the subject of the assessment for local taxes, after the South Pennsylvania Railroad Company had definitely and finally *abandoned the construction* of its railroad, was necessary and indispensable to the performance of its corporate franchises. It never came into existence as an operating railroad; and neither said company, or its successors in title, can claim that its real estate was exempt from local taxation . . ." (Italics supplied). It is apparent, therefore, that the court below did not hold that at the time these assessments were made that this roadbed was abandoned. Nor was it disputed that it belonged to the South Penn Company by "lawful and unrestricted purchases" and that this Company had "perfect title", i. e., the possession, the right of possession and the right of property therein, in 1892 and 1893, for it was the common source of the parties' title. Such a title is in no danger from the doctrine of abandonment, for ". . . the doctrine of abandonment does not apply to a perfect title, but only to imperfect titles,"[2]

---

[2] "Perhaps this is somewhat qualified by *Kreamer v. Voneida*, 24 Pa. Sup. Ct. 347, affirmed in 213 Pa. 74, but the qualification does

*Bear Valley Coal Co. v. Dewart*, 95 Pa. 72, 78. However, there could be no title by adverse possession here in anyone else; nor is any alleged in this case at the time of the assessment in 1892 and 1893. The S. P. Ry. Co. was only two years old at that time. What the court below does hold is that the "Railroad Company had definitely and finally *abandoned the construction* of its railroad" (italics supplied), and therefore, this right-of-way was not "necessary and indispensable to the performance of its corporate franchise," making it amenable to assessment for local tax purposes. This was error.

Under the Act of 1849, February 19, P. L. 79, Sec. 19,[3] (67 PS 142, Sec. 272), "if any company incorporated . . . shall not commence the construction of their proposed railroad within three years . . . or if after completion, the said railroad shall be suffered to go into decay . . . for . . . two years, then this charter shall be null and void." By Act of June 25, 1885, P. L. 186; 1893, June 16, P. L. 463, Sec. 1 (67 PS 344, Sec. 551), it is provided that "Whenever any railroad . . . shall have been sold, or shall hereafter be sold and conveyed, under and by virtue of any process or decree of any court of this state, or of the circuit court of the United States, . . . and the person . . . for . . . whose account such railroad was purchased, shall have proceeded

---

not help appellants, the syllabus which they quote accurately stating the point decided to be as follows: 'A perfect title passing by the Commonwealth's patent (as here admittedly it has done) is in no danger from the doctrine of abandonment, unless, in consequence of (the) abandonment, adverse possession is taken by another and held for the period of the statute of limitations.'" *Parks v. Pa. R. R. Co.*, 301 Pa. 475, 481, 152 A. 682. However, title by adverse possession cannot be acquired to land used by a railroad company for its right-of-way. We discuss this question more fully later in the opinion. This rule is otherwise, however, as to property of a railroad not connected with the right-of-way, and hence not directly used for public purposes.: *D., L. & W. R. R. Co. v. Tobyhanna*, 228 Pa. 487 and 232 Pa. 76.

[3] See also Act of April 4, 1868, P. L. 62, (67 PS Secs. 25, 26) and the supplements thereto.

to organize a new corporation . . . , such new corpora-
tion . . . shall have a period of five years from the date
of the organization for the completion of such rail-
road . . ."

These Acts can have no application here because the
South Penn Co., commenced the construction of its pro-
posed railroad within three years, and the railroad com-
panies which were successors in title to the South Penn
Co.'s franchise have conformed to them.[4] Having ob-
served these enactments, it cannot be held that these
companies "had definitely and finally abandoned the
construction of its railroad," for their acts were in ac-
cordance with the legislative regulation and therefore
inconsistent with an abandonment. In this case it is
important to note that this South Penn Company was
sold under the process of a "court of this state" (i. e.,
the court of C. P. of Fulton County), and the S. P.
Railway Co., a new corporation was organized, which
had under the statute a period of 5 years from 1890
for the completion of this railroad. Under these cir-
cumstances, the assessments of 1892 and 1893 upon
which the tax sales were based, were obviously prema-
ture. However, we have always held that the failure to
construct or maintain a railroad can only be taken ad-
vantage of in a direct proceeding against the Company
in behalf of the state for the purpose of procuring a
judgment of forfeiture by reason of the non-user of the
franchise: *Western Pa. R. R. Co.'s Appeal*, 104 Pa. 399;
*Comm. v. Bank*, 28 Pa. 383; *Comm. v. Hulings*, 129 Pa.
317, 318; Pierce on Railroads, 11.

In the case of *Petition of the Phila. & Merion Ry Co.*,
187 Pa. 123, 40 A. 967, our court held that where a turn-
pike road company has a franchise under an old charter
to construct and operate a street railway upon its road-
bed, but has never exercised such right, the franchise
can be forfeited only in a direct proceeding by the Com-
monwealth.

---

[4] Nor does the Act of May 5, 1903, P. L. 13 (67 PS 456), have
any application here for it relates only to railroads which *have been*
in operation.

In *New Castle v. Pitts. Y. & R. Co.,* 72 Pa. Superior
Ct. 135, 142, the city of New Castle graded the street
along an old right-of-way of the railroad company and
attempted to levy an assessment against it. To a sci. fa.
sur municipal claim, an affidavit of defense was filed
claiming exemption from the assessment. In 1878 the
original railroad changed the location of its track about
100 feet southeast of the former one, and used it for its
main line. The old line track was not operated; the
rails were taken up and used elsewhere. The tracks were
not relaid for eleven years. President Judge ORLADY
said: "It is urged because the railroad company changed
its track from the original location to a new one, 100 feet
eastward therefrom, and did not continuously use this
land so originally taken for active railroad uses, that
it was equivalent to an abandonment for such purposes.
We cannot agree to this. The title never changed,—the
railroad company could have at any time relaid their
tracks. No other rights were affected. It was for the
officials of the Company to decide, when the relaying
of the tracks was necessary, so as to be in direct use for
railroad purposes. . . ."

In *Erie v. Piece of Land,* 175 Pa. 523, 525, 34 A. 808,
we held that "the reason why such property (right-of-
way) so used, is exempt from taxation as real estate,
is that it is not real estate but is a part of the corporate
franchise. If any part of the ground in question was
used for other purposes than as the bed of a railroad,
that portion would be liable to taxation. . . ." See also
*Phila. v. P. & R. R. R. Co.,* 38 Pa. Superior Ct. 529, 530.
The roadbed which is the subject of these proceedings
was a part of the corporate franchise. It was covered
in the bond issue of $20,000,000 issued to the public in
1885. It was the subject of the judicial sale to the S. P.
Railway Co., in 1890, only two years before the assess-
ment of it for local taxation. That it was a part of the
corporate franchise was never disputed. What the court
below held was that its construction was abandoned
and that it was therefore not necessary to its corpo-

rate franchise. Conceding that the construction of this right-of-way, which was the only line laid out in the corporate franchise, was abandoned, how could the public rights therein be defeated? In *Conwell v. P. & R. Ry. Co.,* 241 Pa. 172, 174, 88 A. 417, this court through Mr. Justice STEWART said: ". . . In the course of the opinion of the first of the cases referred to we said: 'The right-of-way of a railroad company, whatever its established width, as soon as acquired is impressed with a public use; it constitutes a public highway. The railroad company holds it in trust for the people of the Commonwealth.' It would have been unnecessary elaboration in view of the one point before us in that case, to have there referred to the legal incidents which attach where such a trust for the public exists. It is appropriate now to add to what we there said, that a trust of this character is a direct and continuing trust against which no statute of limitations runs, and that the subject of the trust admits of no alienation by the trustee *by abandonment* or otherwise in defeat of the public rights therein . . ." (Italics supplied.) To this he added, on page 175: "If no direct application of the rule to rights of way of a railroad company is to be found in our own cases, it is only because these rights have been so generally and uniformly respected throughout the State that no case has arisen calling for its application."

The right which the court below here held was abandoned is the subject of the corporate franchise which was granted by the Commonwealth. The holder of this corporate franchise must use it for the purposes for which it exercised its power of condemnation and for which it obtained its franchise, or else submit to its reversion *at the suit of the state*: 2 Lewis' Eminent Domain, Sec. 594, et seq. In these proceedings the court cannot hold that the right-of-way admits of alienation by abandonment. The sovereign forbids *abandonment by the voluntary act of abandoner.* The only abandonment the law recognizes is an abandonment *with the consent of the Commonwealth. There is no such consent here.*

Since, therefore, this right-of-way, by reason of the public trust impressed upon it, remained part of the corporate franchise until the Commonwealth acts, it was exempt from any assessment for local taxation as real estate. The tax assessed in 1892 and 1893 upon which the sale was held, and which is the genesis of the plaintiff's title, was *not* lawfully levied and the tax sale was void. It follows that plaintiff's "tax title" was only "color of title", i. e., the *appearance* of title without its *reality*.

The plaintiff also asserts title by adverse possession. The evidence showed that the Commission incontrovertibly acquired the record title to all the rights-of-way and property and franchises of the South Penn Company by due legal steps, from the South Penn Company to the S. P. Railway Co., and from the latter to the Fulton Company and from the latter to the Turnpike Commission. Plaintiff attempts to efface this record title by one it acquired by adverse possession. How title by adverse possession can be acquired to the right-of-way of a railroad plaintiff does not enlighten us. In *Conwell v. Phila. & Reading Ry. Co.* (supra), we held that no right of occupancy in the right-of-way of a railroad company within its established width can be acquired by adverse and continuous use for twenty-one years. This is based upon the theory that "the right-of-way of a railroad company . . . *as soon as acquired* is impressed with a public use." (Italics supplied.) The doctrine is imbedded in the law in Pennsylvania that land embraced within a railroad right-of-way is held for public purposes and for that reason cannot be acquired by adverse possession. In *Reading Co. v. Seip,* 30 Pa. Superior Ct. 330, it was held that the land claimed by the defendant by adverse possession having been purchased by predecessors in title of plaintiff for railroad purposes, and having been used for the construction of switches adjacent to and diverging from the main track, was held by the railroad for a public use, under the grant of its right-of-way, and that no title could be acquired by the

defendant to the surface of any portion of what was used for such a purpose, by adverse possession however long continued. The public use arises as soon as it is acquired, and it continues at all time during the life of the franchise against which no prescription runs. While no final judgment making ultimate disposition of this case can now be entered upon this record, the court below on another trial will apply the law as herein declared.

There is another question raised by the appellee, which can likewise be disposed of at the next trial. It relates to the title to Section 2, which was the Moses Friedline property.

The evidence showed that Moses Friedline conveyed the tract of land to the South Penn Company. This tract was never assessed for local taxation and was therefore not in the tax sale of 1894. The plaintiff contended that its title to this tract was "by adverse, continuous and open possession by it and its predecessors in title . . . , since 1905." However, it offered in evidence a deed dated November 11, 1905, to the Somerset Company, its predecessor in title, from Edward H. Miller and wife, the son-in-law and daughter of Moses Friedline for the right-of-way that was conveyed in fee simple by Moses Friedline to the South Penn Company in 1885. The appellant points out that the deed from Miller to the Somerset Company in 1905, only ten years later, recited that "title to said strip of land subsequently to said conveyance by Moses Friedline to South Pennsylvania Railroad Company has become vested in Edward H. Miller . . ." There is no evidence whatever that this property became "vested in Edward H. Miller". Certainly it did not become vested in him in 1905 by adverse possession even if he claimed by such possession immediately subsequent to the conveyance by his father-in-law to the South Penn Company. Only ten years had elapsed between the two conveyances. No attempt was made to show a deed from the South Penn Company to Miller. *How* he "became vested" with this title nowhere appears. The commission showed that Moses Friedline died tes-

tate leaving only one child, the daughter who was married, and that Moses Friedline's will devised only a life estate to her and that she died in 1936. We find no evidence anywhere in this involved record that the possession of this tract by the plaintiff's predecessors in title was held in any other manner than under the deed from Moses Friedline's daughter. Possession was with their consent and under the deed it could not become adverse until after the termination of her life estate which occurred in 1936. See *Dice v. Reese,* 342 Pa. 379, 21 A. 2d 89. But this finding is not necessary to the adjudication of this case in view of the rule of law that land embraced within a railroad right-of-way cannot be acquired by adverse possession.

Counsel for the Commission submitted this point for charge: "You are instructed that as A. D. Graham & Company has produced no evidence in this case to show that it has a paper or other title to the right-of-way granted to South Pennsylvania Railroad Company by Moses Friedline, and referred to in this proceeding as the Frank B. Miller tract of land, it cannot recover any damages from the Pennsylvania Turnpike Commission in this case for its use and occupancy of said right-of-way." The trial judge properly affirmed this point and then said: "The plaintiff has not offered any paper title or record title to the Moses Friedline tract of land. It has offered in evidence a deed from the daughter of Moses Friedline and her husband, but under that deed it acquired only her life interest, which expired in 1936. As to the Moses Friedline tract of land, we do not think that the plaintiff has established its claim, either by record title, paper title, or by adverse possession." Inadvertently the question of the ownership of "the continuous right-of-way strip" which included this tract was submitted to the jury in a form for a special verdict and this strip of land [5]

---

[5] As this is the central one of three sections, its subtraction from the strip in controversy left a "gap" in the right-of-way. making it non-continuous and the fact of this gap should have borne down heavily in reducing damages.

was improperly included in the strip 2.14 miles in length upon which the award was made.

The order of the court below granting a new trial is affirmed.