O'Dwyer *v.* Ream, Appellant.

Argued September 30, 1957. Before JONES, C. J., BELL, CHIDSEY, ARNOLD, JONES and COHEN, JJ.

*Charles F. C. Arensberg,* with him *Frank R. Coder, Ella Graubart* and *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*Frank A. Orban, Jr.,* with him *James B. Landis,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, November 11, 1957:

This is an action in equity praying that the defendant-owner of the surface rights and part of the mineral rights of a 263 acre farm be required to cause a survey to be made to delineate plaintiffs' sub-surface coal rights, that defendant be decreed a trustee as to the coal found to belong to plaintiffs, that he account for any encroachments into plaintiffs' coal, that he be restrained from exercising any incidents of ownership over plaintiffs' coal, and other appropriate relief.

Prior to 1902, this 263 acre farm and all of its mineral rights were owned by Cornelius Cober and Elizabeth Cober, his wife. In the neighborhood it was well known that there are numerous coal seams beneath the surface of the land. Some four to six seams of varying thickness were known to lie at different levels above a rather prominent layer of sandstone known as the Mahoning Sandstone, which itself lies at a depth of about 380 feet from the surface. Beneath the Mahoning Sandstone there are several seams of coal designated alphabetically; the first seam below it being known as "E" coal, lying at a depth of 460 feet, and below that seam lies the D seam, the C prime seam, and C seam, etc.

On February 28, 1902 Mr. and Mrs. Cober conveyed to one J. J. Hoblitzell "all the coal" under their 263 acre farm, excepting (1) "the coal above the Mahoning sand stone" and (2) "one hundred acreas of coal bed geologically known and designated as 'E' to be hereafter surveyed from the northeast end of the farm". It is as to this 100 acres of "E" coal that the dispute arises.

Hoblitzell's interest, "all the coal" under the farm except that above the Mahoning Sandstone and the 100 acres of E coal, was subsequently conveyed to the Brothersvalley Coal Company, and thence in 1938 to one James F. Davis.

When Mr. Cober died in 1913, he devised his interest in the farm to his widow, so at that point Mrs. Cober owned the farm surface, the coal above the Mahoning Sandstone, and the 100 acres of E coal in the northeast end of the farm.

On October 27, 1920, Mrs. Cober leased to the plaintiffs, O'Dwyer and Beachley ". . . all of the seam of coal owned by the lessor, and reserved by Cornelius Cober in a deed from the said Cornelius Cober and Elizabeth Cober, his wife, to J. J. Hoblitzell . . .". The lease was to run "during the time that it will be necessary to exhaust" the coal, and in consideration thereof the plaintiffs-lessees were to pay to Mrs. Cober a minimum royalty of $100 annually during the life of the lease (except during those years in which the royalties for coal removed ran over $100), and a royalty of 10 cents per ton at the time the coal was removed from the ground.

After Mrs. Cober's death, her heirs sold to the defendant, John O. Ream, by deed dated March 11, 1929, the 263 acre farm and assigned to him the royalties due under the 1920 lease with the plaintiffs. Prior to 1934, plaintiffs, who have never mined any of the coal in question, had paid to defendant some $300 in royalties. No payment of royalties was made between 1934 and December, 1950, at which time the plaintiff Beachley tendered $1850 to the defendant Ream, which Ream refused to accept.

Therefore, in 1938 (when James F. Davis became owner of the coal rights under the farm, less those rights excepted by the Cobers in the 1902 deed) the various rights stood as follows: (1) the plaintiffs owned the coal excepted from the 1902 deed, to wit: the coal above the Mahoning Sandstone and the 100 acres of E coal in question, still unsurveyed, at the northeast end of the farm; (2) James F. Davis owned all the coal

under the surface except that which plaintiffs and defendant both claim; (3) and the defendant owned the surface of the farm, a right to royalties from plaintiffs, and whatever residual rights existed under the 263 acre farm.

Prior to 1941, James F. Davis, who also owned the coal rights under the tract immediately adjoining the "Cober" farm on the eastern side, had been engaged in mining operations on that adjoining tract, and had begun to make incursions into the E coal under the "Cober" farm. In 1941, negotiations were begun with respect to these encroachments, and on November 12, 1947 a deed acknowledged on July 2, 1941, was recorded in Somerset County. This deed between Davis and the defendant Ream recited a transfer of portions of the E coal from Ream to Davis; and a transfer of another portion of the E coal, and some of the E coal owned by Davis on the adjoining tract to Ream, as a result of which any conflict between Davis and Ream was considered settled. There is a question as to whether the plaintiff Beachley was involved in the 1941 negotiations, but no question that he is not mentioned in the deed as recorded in 1947.

In 1951 Ream leased some of the E coal to one Harold R. Will, who began mining operations on the tract, and paid to the defendant Ream the royalties due from the mining under the terms of their lease. On February 28, 1951, this complaint in equity was filed praying that the defendant be required to survey and delineate the 100 acres owned by plaintiffs, account for income from any coal wrongfully mined, etc.

Initially, the defendant filed preliminary objections under Equity Rule 48, contending that plaintiffs' remedy, if any, was at law in ejectment or trespass, and not by bill in equity. The chancellor overruled these objections, holding in his opinion that: ". . . while a

court of equity does not have jurisdiction to fix the boundaries of this reservation, it does have jurisdiction to compel the defendant to specifically perform the obligations contained in the title under which he claims his ownership and possession."

The defendant thereupon made answer to the chancellor's holding by renewed preliminary objections particularly raising the question of whether a court of equity could cause a survey to be made after the passage of so many years, as prayed for in plaintiffs' complaint; and contending that plaintiffs had abandoned any rights they might have had in the 100 acres of E coal. In a second opinion, the chancellor again dismissed the preliminary objections, holding that the plaintiffs had a right to the 100 acres of E coal by virtue of their lease from Mrs. Cober; and that plaintiffs' right extended to the E coal and was not limited to the coal above the Mahoning Sandstone, as contended by the defendant.

An answer on the merits was filed and the case came on for hearing before the chancellor, who specifically found that the plaintiffs were the owners of the 100 acres of E coal in question, that they had not abandoned their rights in the coal, and that there has been an encroachment upon plaintiffs' coal; and the chancellor thereupon ordered that the defendant file an accounting. Exceptions were filed, and a final decree was entered on July 27, 1957 ordering the defendant "to file an account in accordance with the prayer of the complaint", from which decree this appeal is prosecuted.

Appellant contends (1) that equity cannot compel the designation of coal which the parties themselves have not designated; (2) that the exception of coal "to be hereafter surveyed" is void because of the passage of years without a survey; (3) that the lease of

coal rights from Mrs. Cober to plaintiffs in 1920 did not convey rights in 100 acres of E coal, because any rights Mr. Cober might have had were abandoned when he did not have the E coal surveyed between 1902 and 1913 (when Mr. Cober died); (4) that the chancellor cannot order an accounting without designating the coal to be accounted for, and (5) that the "action is barred".

Underlying all these contentions is the basic question of whether the exception of "one hundred acres of coal bed geologically known and designated as 'E' to be hereafter surveyed from the northeast end of the farm . . ." is sufficiently clear and definite to grant adequate title. The chancellor found that the exception was sufficiently clear to place good title in plaintiffs. We cannot say that he erred in this determination.

There is no uncertainty as to what is meant by the "E" coal, and indeed no question is raised in this regard. An acre still means 43,560 square feet or 160 square rods, as it did in 1902, and 100 acres are still quite susceptible of simple calculation. The only question is as to what was meant by the northeast end. Here too, the delineation in the 1902 deed is sufficiently clear.

The 263 acre farm is roughly trapezoidal in shape, although one of the non-parallel sides is quite irregular and a projection of some thirteen and a half acres extends out from it. The upper (not quite) parallel boundary of the trapezoid has, for the greater part of its length, a direction of South 46° West, or, put otherwise, it is but one degree from being a true northeast-southwest line. The lower line of the trapezoid is not quite parallel to the upper, having a direction of North 58° East, but it is sufficiently parallel to make the farm run in its longer measurements in an unmis-

takably northeast-southwest direction. Under these circumstances there can be no question which part of the farm is that designated as the "northeast end". With this much information at his fingertips it would be a very simple matter for a surveyor to drop a line running in direction perpendicular to the mean difference between the upper and lower generally northeast-southwest boundaries of the farm, and so located as to mark off 100 acres from the irregular northeast side of the farm. It is purely a matter of mathematical calculation. The irregularity of the one side of the farm would not affect the perpendicular line which would fall well within the trapezoidal area, about one-third of the way in from the northeast side of the farm.

In the case of *Rounsley v. Jones*, 2 Walk. 112 (1883), this Court had before it an exception in a deed of a farm which ran generally northwest to southeast with irregular borders which read: "Excepting the iron ore banks which are on the west side of said tract of land . . .". In an action for damages for iron ore wrongfully removed brought some 40 years after the execution of the deed, this Court upheld an award of the value of the iron ore removed from the west (really southwest) side of a line drawn down the middle of the tract, as against the contention that the line ought to strictly conform to the north-south meridian, thus delineating a true east-west division of the farm. Clearly implicit in the decision is the conclusion that directions must be understood in reference to the specific tract in question, and not abstractly in their compass sense.

With a description as definite as here involved, there can be no question but that the chancellor did not err in finding that the plaintiffs were clearly the owners of the 100 acres of E coal. Accepting, as we do, the factual determination that the 100 acres of E coal

were sufficiently designated in the 1902 deed, it is clear that appellant's legal contentions must fail.

Appellant's first contention is that "Equity has no jurisdiction to compel the designation of coal which the parties have not designated." This contention is answered primarily by noting that the coal acreage in question is adequately located by the deed of 1902. The only question here is whether equity may require a survey to be made to ascertain physically a line which exists as of right. Of this we think there can be no doubt. The survey prayed for in this bill is necessary to ascertain how much of plaintiffs' coal has been encroached upon in order to accomplish the accounting ordered by the chancellor. It is an ancillary prerequisite to the equitable relief ordered by the court below. The coal in question was designated by the lease of 1902; the survey here requested does no more than fix the line physically. No one would contend that an exception was uncertain if the boundary line of the exception was designated as following a certain portion of the 40th parallel or a designated portion of the Somerset-Cambria County line, although that line might not be clearly marked physically at a particular point. A survey would certainly be proper to help determine whether a given house, or tree, or mine, fell along one side or the other of that boundary line. And so too in the instant case, the survey will merely fix physically a boundary line, the location of which is adequately set forth in the deed.

In *Henry v. Black*, 210 Pa. 245, 59 A. 1070, which concerned the question of whether a receipt for purchase money designating a property merely by hotel name was a sufficient description, this Court said, p. 249: ". . . is the description in the writing full enough to enable a court to make a decree of specific performance of the contract? The identity of the location

is fixed by the name of the hotel. Given the hotel site, the lots on which it stands and the ground properly appurtenant to it, can be ascertained by measurement to a certainty. Our records in rural counties are full of deeds which describe thousands of tracts of land conveyed only by their warrantee names; no one thinks of objecting to them for insufficiency of description; if a dispute arises a survey identifies their location; a copy of the official survey from the land office establishes their exact boundaries and quantities of land. . . ." The survey here prayed for is simply an effectuation of the well known maxim: *id certum est quod certum reddi potest.*

Appellant further contends that equity has no jurisdiction to try title to land, or to fix boundaries. In *Richmond v. Bennett,* 205 Pa. 470, 55 A. 17, in a section quoted or paraphrased with approval in *Pittsburgh v. Pittsburgh & Lake Erie Railroad Co. et al.,* 263 Pa. 294, 301, 106 A. 724; *Onorato v. Carlini et al.,* 272 Pa. 489, 493, 116 A. 387; and in *Hunter v. McKlveen, Prothonotary et al.,* 353 Pa. 357, 361, 45 A. 2d 222; the following appears at p. 474: ". . . It is true that in actions respecting real property, where the plaintiff's right has not been established at law or is not clear, he is generally not entitled to remedy by injunction; but where in a proceeding in equity, the plaintiff's title is clear, and all the evidence relating to it is of such a character that a judge in a trial at law, upon the same evidence, would not be at liberty to submit the question of the plaintiff's title to the jury, equity will grant relief although there has been no adjudication of the title at common law: Edgett v. Douglass, 144 Pa. 95; Manbeck v. Jones, 190 Pa. 171."

The second contention of appellant, to wit: "An exception of acreage to be hereafter surveyed is void when no survey is made for forty-nine years", and his

*third contention:* "The lease of the coal excepted in a former deed conveys to the lessees only the coal validly excepted", both proceed on the basis that the exception in the 1902 deed was too indefinite to be enforced. Our prior discussion adequately disposes of the basis for these contentions.

Similarly, the fourth contention of appellant that: "The Lower Court cannot order an accounting without designating the coal to be accounted for", is adequately answered by our affirmance of the chancellor's determination that the coal in dispute is sufficiently described to permit enforcement of the exception to the 1902 deed, and that equity has jurisdiction over this dispute. It is not seriously contended that, admitting the jurisdiction of the court and the certainty of the deed, equity is without power to order an accounting, a traditional form of equitable relief.

Appellant's last contention is the "Plaintiffs' action is barred" by the Act of April 22, 1856, P. L. 532, Sec. 6, 12 PS §83, which sets a five year limitation on actions for specific performance of a contract for the sale of real estate. This rests on the theory that this is an action to specifically enforce that portion of the exception to the 1902 deed which reads "to be hereafter surveyed". This is patently incorrect. The deed of 1902 and the 1920 lease by which plaintiffs acquired ownership have been of record in Somerset County for over thirty years. The final decree of the chancellor in this case orders an *accounting* for encroachment into plaintiffs' coal. The Act of April 22, 1856 clearly has no bearing.

The second part of this last contention is founded on a sort of "abandonment" theory, and indeed this term "abandonment" appears throughout appellant's brief. It would be a sufficient answer to note that ordinarily abandonment is a question for the trier of

fact, *Eckel v. Eiswerth,* 371 Pa. 490, 92 A. 2d 174; *Llewellyn et al. v. Philadelphia & Reading C. & I. Co.,* 308 Pa. 497, 162 A. 429; and the chancellor in this case specifically found that "2. There has been no abandonment by these plaintiffs of their rights under the coal lease agreement", a finding clearly sustained by the evidence.

Furthermore, once it is determined, as here it has been, that plaintiffs-appellees took good title ab initio, and that they recorded that title in 1921, then the abandonment theory must fail. ". . . It has frequently been held that abandonment of title is not to be presumed from a mere failure to possess the land or from neglect to pay the taxes thereon; inchoate rights may be abandoned but abandonment is not predicable of perfect titles: Mayor of Philadelphia v. Riddle, 25 Pa. 259, 263; Goodman v. Sanger, 85 Pa. 37, 43; Bear Valley Coal Co. v. Dewart, 95 Pa. 72, 78; Kreamer v. Voneida, 213 Pa. 74, 80, 62 A. 518, 520; Parks v. Pennsylvania Railroad Co., 301 Pa. 475, 480, 481, 152 A. 682, 684; Graham & Co., Inc. v. Pennsylvania Turnpike Commission, 347 Pa. 622, 635, 636, 33 A. 2d 22, 28, 29. . . .": *Indiana County Petition,* 360 Pa. 244, 248, 249, 62 A. 2d 3.

Decree affirmed, with costs on appellant.