MARYLAND AND PENNSYLVANIA
RAILROAD PRESERVATION
AUTHORITY, Petitioner,

v.

AGRICULTURAL LANDS CON-
DEMNATION APPROVAL
BOARD, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 1997.
Decided Jan. 8, 1998.

Paul W. Minnich, York, for petitioner.

Dwight-Jared Smith, Harrisburg, for re-
spondent.

Albert G. Blakey and John W. Thompson
Jr., York, for intervenors, Elmer & Patricia
Sueck, et al.

Before COLINS, President Judge,
FLAHERTY, J., and NARICK, Senior
Judge.

NARICK, Senior Judge.

The issue before this Court is whether a
preservation authority may condemn proper-
ty for historical, educational and recreational
purposes that has been found would adverse-

ly impact the farming in an agricultural security area.

The Maryland and Pennsylvania Railroad Preservation Authority (Authority) appeals from the order of the Agricultural Lands Condemnation Approval Board (Board) that denied its request to condemn property in the Lower Chanceford Township Agricultural Security Area Preservation District (agricultural security area), owned by Elmer and Patricia Sueck and Emory and Elaine Downs (Landowners).[1] We affirm.

The York County Commissioners incorporated the Authority and charged it with the duty of acquiring and preserving for historical, educational and recreational purposes what remains of the Maryland and Pennsylvania Railroad Company's track that runs through York County.[2] The goal of the Authority is to preserve the railroad and the Village of Muddy Creek Forks for the enjoyment of the public. The Authority intends to run a small diesel engine with two or three cars back and forth along tracks from one end of an 8–mile line to the other end. As part of the preservation project, the Authority would restore significant structures in the Village of Muddy Creek Forks. In order to accomplish its purpose, the Authority sought Board approval to condemn a forty-foot right-of-way across the property of Landowners, which is part of the agricultural security area.[3] The Authority proposes to condemn a right-of-way over approximately 1.8 acres of the Sueck's property and .03 acres of the Downs' property.

At the hearing before the Board, the Authority offered testimony that the proposed condemnation would not have an unreasonably adverse impact upon the Landowners' property. The Authority presented evidence that there was no reasonable alternative for the project because of the terrain and because of the desirability to incorporate the entire remaining rail tracks which, if not condemned would be lost forever.

The Landowners voiced concern, as the project would attract between 15,000 and 20,000 persons per year. They asserted that the additional traffic would adversely affect their ability to move their farming equipment in the area. But most importantly, Landowners voiced concern regarding fires to the adjacent property because when the railroad was operational fires did occur on the land, which the Authority planned to condemn.

After reviewing the testimony, the Board denied the Authority's application for condemnation finding that there was a reasonable alternative to the condemnation. This alternative would be to allow the track to continue approximately five and one-half miles, stopping short of Landowners' property but while still passing through the Village of Muddy Creek Forks.

On appeal to this Court,[4] the Authority asserts that the Board: 1) lacked jurisdiction over the condemnation; 2) abused its discretion as its findings do not support the refusal to approve the condemnation; and 3) exceeded its authority under the Agricultural Area Security Law (Law), Act of June 30, 1981, P.L. 128, *as amended*, 3 P.S. §§ 901—915.

■ First, the Authority asserts that the Board lacks jurisdiction because it seeks only to condemn land for the *reconstruction of an existing highway*. While admitting that the Board has jurisdiction over condemnation for the creation of a highway, the Authority asserts that the Board lacks jurisdiction over existing highways, such as reconstruction. It asserts that railroads are considered public highways, *Templeton v. L. & W.B. Coal Co.*, 50 Pa. Superior Ct. 341 (1912), and a railroad's right-of-way, while private property has a public purpose. *A.D. Graham & Co. v.*

1. Landowners have intervened in this appeal.

2. The track system was originally narrow gauge, which was standardized in 1901. Train historians believe it is a classic example of a standard gauge on a narrow gauge route and is, therefore, unique. The last passenger service over this track was in 1954, with freight service discontinued in 1978.

3. There are approximately 10,000 acres in the agricultural security area.

4. Our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact are supported by substantial competent evidence. 2 Pa.C.S. § 704.

*Pennsylvania Turnpike Commission,* 347 Pa. 622, 33 A.2d 22 (1943).

However, we do not agree that the property to be condemned is a highway, which is to be reconstructed. The property sought to be condemned is not open to the public. By court order, the right-of-way was found to be abandoned and all right entitled to that property returned to Landowners. (109a, 513a–524a.) This is private land, not opened to the public, a fact recognized by the Authority when it pursued the condemnation. Therefore, we hold that the Board had jurisdiction over the condemnation action.

■ Next, the Authority asserts that the Board abused its discretion in refusing to approve the condemnation because the land to be condemned was less than two acres of woodland that had never been farmed out of the 10,000 acres in the agricultural security area. We do not find this argument persuasive.

Pennsylvania's historical preservation statute, 37 Pa.C.S. §§ 501—512, does not give priority to historical preservation over agricultural lands. However, Section 902 of the Law clearly sets forth its objectives:

It is the declared policy of the Commonwealth to conserve and protect and to encourage the development and improvement of its agricultural lands for the production of food and other agricultural products.

* * * * * *

Agriculture in many parts of the Commonwealth is under urban pressure from expanding metropolitan areas. This urban pressure takes the form of scattered development in wide belts around urban areas, and brings conflicting land uses into juxtaposition, creates high costs for public services, and stimulates land speculation. When this scattered development extends into good farm areas, ordinances inhibiting farming tend to follow, farm taxes rise, and hopes for speculative gains discourage investments in farm improvements. Many of the agricultural lands in the Commonwealth are in jeopardy of being lost for any

agricultural purposes. Certain of these lands constitute unique and irreplaceable land resources of Statewide importance. It is the purpose of this act to provide means by which agricultural land may be protected and enhanced as a viable segment of the Commonwealth's economy and as an economic and environmental resource of major importance.

It is further the purpose of this act to:

* * * * * *

(2) Protect farming operations in agricultural security areas from incompatible nonfarm land uses that may render farming impracticable.

3 P.S. § 902.

Where non-farm uses are proposed which would impede the operation of farms within an agricultural security area, not merely the individual farms proposed to be condemned, the Law must be interpreted in a manner that will preserve the economic viability of farming throughout the agricultural security area.

■ The mechanism which protects agricultural security areas against adverse impacts from condemnation is Section 13 of the Law, 3 P.S. § 913. Section 13 of the Law requires all governmental agencies which intend to condemn any land within an agricultural security area to receive approval by the Board and the governing bodies of the county, municipality and agricultural committees of the municipality in which the proposed condemnation is to take place.[5] Section 13(d) of the Law, 3 P.S. § 913(d), imposes a duty on the Board and the other reviewing bodies to reject all applications for condemnation in which the applicable basis for approval is not demonstrated by the evidence presented. The agency seeking condemnation has a burden of proving that the agricultural security area will not be substantially impacted by the proposed condemnation. In *Northwestern Lehigh School District v. Agricultural Lands Condemnation Approval Board,* 134 Pa. Cmwlth. 291, 578 A.2d 614 (1990), we held

5. The sole exception is public utilities whose projects and land acquisition have been approved by the Pennsylvania Public Utility Commission or the Federal Energy Regulatory Commission.

that the school district did not present evidence regarding the impact that the proposed condemnation would have on the *entire agricultural area.* Here, the evidence submitted by the Authority at the hearing addressed the relative impact solely on the proposed condemnation of Landowners' property. The Authority did not offer any evidence that the agricultural security area would not be adversely affected by the increase in traffic and possible damage fires from the train itself could cause, and thus, did not meet its burden.

 Finally, the Authority asserts that the Board misinterpreted and misapplied the provisions of the Law when it went beyond the bounds of the Law and considered a "no-build" alternative.

In considering a proposed condemnation of land located in an agricultural security area, the Board must apply the following standards:

[T]he Agricultural Lands Condemnation Approval Board or other appropriate reviewing body shall approve the proposed condemnation only if it determines that:

(A) the proposed condemnation would not have an unreasonable adverse affect upon the preservation and enhancement of agricultural or municipal resources within the area or upon the environmental or comprehensive plans of the county, municipality and the Commonwealth, or upon the goals, resource plans, policies or objectives thereof; or

(B) there is no reasonable and prudent alternative to the utilization of the lands within the agricultural security area for the project.

3 P.S. § 913(d)(2)(ii)(A) and (B). The Board determined that the Authority did not show that there was no reasonable and prudent alternative and in particular, the Board found that "there is a reasonable and prudent alternative and that is to terminate the Railroad at the western property line of the Suecks." (24a–25a.)

The Authority asserts that the "no-build" alternative renders the Law meaningless because if not building the project was truly a reasonable alternative, no project would ever go forward under the Law. It asserts that a strict construction of Section 913(d)(2)(ii)(B), requires the Board to consider alternatives to the project which accomplish essentially the same ends as the project originally proposed.

 The Board counters stating, however, that all of the Authority's objectives for its rail project can be met without the Authority condemning rights-of-way across Landowners' property. While the Board's order shortens the overall length of the track, it would still allow the Authority to accomplish all of its stated objectives.[6] It is the Authority's burden to show that there existed no reasonable and prudent alternatives to the condemnation of rights-of-way over the land, which is part of the agricultural security area for its railroad project. *See Northwestern Lehigh.* The Board found that the Authority did not meet this burden and we view the alternative proposed by the Board as an appropriate alternative.

Therefore, we hold that the Board correctly determined that the Authority did not meet its burden under the Law and thus, the Board properly denied the Authority's request for condemnation of Landowners' property.

Accordingly, we affirm.

---

**6.** 1. Preserve the village of Muddy Creek Forks for as the main point of embarkation for rail excursions. (117a).

2. Establish and operate a museum relating to the Maryland and Pennsylvania Railroad. (75a).

3. Run trains into and out of Muddy Creek Forks, thereby preserving a portion of the historic railroad responsible for that village's existence. (76a, 117a).

4. Preserve sufficient rail track to allow persons riding the excursion train to experience the 'flavor' of the Maryland and Pennsylvania Railroad's history by running the train through several towns along what remains of that railroad's tracks in York County. (114a).

5. Create a project that preserves the history of the Maryland and Pennsylvania Railroad and provides an educational and recreational experience for the public. (105a, 439a).

6. Operate steam, coal, diesel, or other engines on the rail tracks. (439a).

## ORDER

AND NOW, this 8th day of January, 1998, the order of the Agricultural Lands Condemnation Approval Board in the above-captioned matter is hereby affirmed.