# Harlan *et al. versus* The Lehigh Coal and Navigation Company.

A lease of the right to mine coal in the land of the lessor, is the grant of an interest in the land, and not a mere license to take the coal.

In such a lease, there is no implied warranty that the land contains coal veins.

Although a contract may be construed to involve an express warranty, when none is in terms expressed, if our common sense of justice require it, and it be essential to complete the definition of the relation plainly intended to be established between the parties; yet, its terms must be clearly deducible from the instrument, and from the nature of the transaction.

If the parties to a coal lease were under a mutual mistake as to the existence of coal veins in the land demised, the proper remedy of the lessee is by a proceeding to rescind the contract; he cannot have relief in an action in affirmance of it.

ERROR to the Common Pleas of *Carbon county*.

This was an action of covenant by Ezekiel W. Harlan and Robert Henderson against The Lehigh Coal and Navigation Company, upon a covenant alleged to be contained in a coal lease from the defendants to the plaintiffs, that the places therein designated were veins of stone coal. The breach alleged was, that the supposed mines were not coal-mines, and did not contain stone coal, contrary to the tenor and effect of the defendant's covenant. The case was before this court on a former writ of error, and is reported in 3 *Casey* 429. The following is a copy of the lease:—

"This indenture, made the twelfth day of April, in the year of our Lord 1847, between the Lehigh Coal and Navigation Company of the first part, and Ezekiel W. Harlan and Robert Henderson of the second part, witnesseth, That the said party of the first part, for and in consideration of the payment of the rent and performance of the covenants and agreements hereinafter mentioned, on the part of the said party of the second part hereto, to be paid, performed, observed, and kept, have let and demised, and hereby do let and demise unto the said party of the second part, the right and privilege to mine and take away stone coal from the veins known as the R. and S. veins, and any other veins intermediate between said veins and the Q. vein, in the Sharp Mountain, on the land of the said party of the first part, near to the town of Tamaqua, in the county of Schuylkill, and state of Pennsylvania: To have and to hold the rights and privileges hereby demised unto the said party of the second part, from and after the 1st day of April 1847, for and during the term of three years thence next ensuing, fully to be complete and ended on the 31st day of March, A. D. 1850; yielding and paying therefor unto

[Harlan *et al. v.* The Lehigh Coal and Navigation Company.]

the said party of the first part, their successors and assigns, the rent or sum of 25 cents per ton, for each and every ton (of 2240 pounds) during the said term, so mined and taken away, of the size that would, in the ordinary course of screening, pass through an inch square mesh, and over a three-eighths inch square mesh, and commonly called chestnut coal; and for all coal of a larger size than the above, 50 cents per ton (of 2240 lbs.), making a deduction on the whole of said rent of five per cent., as is hereinafter provided.

"And it is further covenanted and agreed by and between the said parties, that the said party of the second part shall mine and take away from the said veins and from the P. and Q. veins now in possession of the said party, at least fifty thousand tons of coal in each and every year during the continuance of this lease, provided the said veins, by all proper management, means, efforts, and exertions, can be made to yield or produce the said quantity of coal above specified; said party of the second part shall use all necessary and proper diligence and precautions that may be required, to enable them to mine and take away the quantity aforesaid, by running gangways and schutes, day and night, in such manner as may be directed by the mine agent of said party of the first part. But if the said party of the second part shall not use, in the opinion of said agent, the necessary means, efforts, and exertions, in working the said veins, and shall, in consequence thereof, fail to mine and take away the said quantity, they shall notwithstanding pay to the said party of the first part the same amount of rent as if they had mined and taken away the full quantity of 50,000 tons, as above specified. All the rent that may accrue by virtue of these presents shall be paid by the said party of the second part to the said party of the first part, their successors and assigns, in quarterly payments, on the first day of the months of July, October, January, and April.

"And it is further mutually covenanted and agreed, by and between the said parties, in manner following, that is to say:

"1. That the said party of the second part shall and will, at the expiration of every quarter during this lease, furnish to said party of the first part a statement signed by themselves of the number of tons of coal mined during the then next preceding quarter; and the weight of such coal shall be ascertained, fixed, and determined by the railroad scales near Tamaqua, attested by the superintendent of said scales; for all of which the said party of the second part shall pay quarterly the rent hereinbefore stipulated to be paid, less the deduction of five per cent., as aforesaid, unto the said party of the first part, their successors and assigns; and, on failure to pay the rent accruing under this lease, as the same shall become due, according to the terms and conditions hereof, in manner aforesaid, it shall and may be lawful for

the said party of the first part, their successors and assigns, to enter on the said demised premises, and to distrain the goods and chattels then and there found, and to proceed with and sell the same, according to the usual course of distress for recovering rents in arrear.

" 2. That all the coal the said party of the second part may mine as aforesaid, shall be screened and prepared in the best possible manner, and be at all times subject to the inspection and approval of the mine agent of the said party of the first part. And should said agent, at any time or times, decide that the coal is not properly prepared, it shall not be permitted to go to market till properly selected.

" 3. That all the refuse coal or dirt, taken out of said veins, shall be deposited in such position or places as the said mine agent may from time to time direct.

" 4. That the said party of the second part will, at their own expense, and subject to the direction and approval of the superintendent and engineer of the said party of the first part, make all the necessary improvements for opening and working the said veins by driving a slope from a point to be selected by said superintendent and engineer, into the R. or P. vein, at this latter point driving a tunnel across into the S. vein, and bringing the coal from both veins by said slope to the head of the inclined plane now in use for the Q. vein, and thence transferring it to the breakers and screens now in use for the coal from said Q. vein; the said party of the second part also providing, at their own expense all the additional machinery required for breaking and screening said coal. The said improvements to be completed on or before the 1st day of April 1848.

" 5. That the veins shall be worked in the manner directed by the said company's mine agent, and all the coal shall be taken out as clean as shall be consistent with safety, and the gangways left in good working order at the expiration of this lease; and the mine agent, or the superintendent, of the said party of the first part, shall have the right at all times of free ingress and egress to and from said vein, to see that the terms, conditions, and stipulations of this agreement are faithfully observed and performed.

" 6. That the said party of the first part, their successors or assigns, shall have the right and privilege to keep at the expiration, or sooner determination of this lease, all the machinery hereinbefore stipulated to be provided by the said party of the second part; said machinery to be taken at a fair and just valuation to be made thereof.

" 7. That the said party of the second part shall and will, at their own cost, lay railroads in the drifts and gangways of said veins, and keep the same in good order and repair, and also shall and will furnish all the rails, to be of white oak or yellow pine,

the drift cars, prop timber, boards, planks and slabs necessary and requisite for the said railroads, gangways, and drifts, subject to the like approval of the mine agent or superintendent of said party of the first part; but nothing herein contained shall be construed as authorizing said party of the second part, to cut or carry away any timber from land belonging to the said party of the first part.

"8. That the said party of the second part shall and will, at their own expense, keep the roads, schutes, engines, screens, breakers, and all other machinery, in good working order, during the continuance of this lease, and at the expiration or sooner determination thereof, shall and will surrender the said demised premises, and all their right and claim to such roads, machinery, and other improvements, as may be constructed or used for properly working the said veins, excepting the additional machinery for breaking and screening, as is hereinbefore excepted, unto and for the use and benefit of the said party of the first part, their successors and assigns.

"9. That on failure to pay the said rent, in manner aforesaid, or if the said veins shall remain unworked for the space of thirty days at any one time, or if the said party of the second part shall transfer or assign this lease, or underlet the premises, without the consent of the said party of the first part, first had in writing, or if the said party of the second part shall, in the opinion of the agent of the party of the first part, neglect, refuse, or be unable on their part to comply with or perform any of the said covenants herein set forth, then, and in either of such cases, this lease, and every matter and thing therein contained may, at the option of the said party of the first part, their successors or assigns, become void; and then, in that case, the said party of the first part may re-enter on the said demised premises, and hold the same as if these presents had not been executed, without prejudicing or affecting any claim they may have for rent or for damages they may sustain for breach by the party of the second part of the covenants above specified, anything hereinbefore contained to the contrary thereof notwithstanding.

"10. That, if the said party of the second part cannot procure, without cost, the right of way through lands owned by others than the party of the first part, then, and in that case, the party of the second part shall, for the purpose of securing such right of way, institute the proceedings, and observe, in all respects, the formalities required by the Act of Assembly of the 5th of May 1832, entitled 'An act regulating lateral railroads,' and the cost of such proceedings shall be borne by the said party of the first part. And, upon the payment of said cost of proceedings, and of all outlays consequent thereon for the obtainment of said right of way, the said party of the second part engage to convey

[Harlan *et al. v.* The Lehigh Coal and Navigation Company.]

to the said party of the first part, by good and sufficient deeds, and clear of all encumbrance, the lands not now belonging to the said party of the first part, which it may be necessary to occupy with said improvements, and which may be acquired either by amicable arrangement with the owners thereof, or by proceedings under the above-mentioned Act of 5th of May 1832.

" 11. That whenever a dirt fault shall occur in said veins, the said company shall and will allow the said party of the second part a fair and just price for running the gangways through all such dirt faults, exceeding ten yards lineal, provided, however, that soft workable coal shall not be considered faults. And, in case the rock or slate closes in so as to cut off the coal, and render it necessary to cut away the rock or slate, in order to obtain the necessary width of gangway, then, and in such case, the said party of the first part shall and will pay the whole expense of removing such rock or slate faults; they, the said party of the first part, at all times being first consulted, and approving, by their assent in writing, of running such gangways in or through any faults.

" 12. That the said party of the first part will make a fair allowance for the railroad iron, and for the spikes necessary for laying the railroads in the main drifts or gangways upon completion of the same, said allowance to be made by deducting it from the rent hereinbefore stipulated to be paid; but no allowance will be made for repairs. And a fair allowance, to be determined by the mine agent of the party of the first part, shall also be made for running the slope and doing the other work necessary for opening the said veins; provided the mode of opening the said veins shall have been upon a plan approved of by the engineer of the said party of the first part; the said allowance to be made by deducting it from the rent hereinbefore agreed to be paid.

" 13. The said party of the second part hereby agree that the mine agent of the party of the first part shall at all times have free access to their mining books and accounts, for the purpose of verifying the returns made of the quantities of coal which may be taken from the several veins hereinbefore mentioned.

" And for the just and true performance and observance of their respective covenants and agreements aforesaid, the said parties do mutually bind themselves, their respective heirs, executors, administrators, and successors, each unto the other, firmly by these presents.

" In witness whereof, the said party of the first part have caused their common or corporate seal to be hereto affixed, and the said party of the second part have hereto set their hands and seals, the day and year first above written."

The court below, in answer to points presented by the plaintiff, charged the jury as follows :—

[Harlan *et al. v.* The Lehigh Coal and Navigation Company.]

" The defendant does not covenant for coal in any of the veins. He lets them, and the plaintiffs take them, subject to the ordinary risk of mining, without any covenant, express or implied, of the existence of coal, or of the quantity or of the quality of coal."

To this instruction the plaintiffs excepted; and a verdict and judgment having been rendered for the defendants, the plaintiffs sued out this writ, and here assigned the same for error.

*Reeder & Green*, for the plaintiffs in error.—The agreement of 12th April 1847, was a grant, and not a mere license: Thomas *v.* Sorrell, *Vaugh.* 351; Wood *v.* Leadbitter, 13 *M. & W.* 845; 2 *Parsons on Contracts* 22; Cook *v.* Stearns, 4 *Mass.* 533. And we appeal to the agreement itself, and say, that the court below erred in ruling that the defendants made no covenant of the existence, quality, or quantity of coal in any of the veins. We insist that it contains such a covenant: Parkhurst *v.* Smith, *Willes* 332; Gibson *v.* Minet, 1 *H. Bl.* 569; *Platt on Covenants* 136; Clanrickard *v.* Sidney, *Hobart* 277; 2 *Wils.* 75; 1 *Vent.* 141; 1 *Mod.* 175; Seddon *v.* Senate, 13 *East* 74; Robertson *v.* French, 4 *Id.* 130; Hargrave *v.* Smee, 3 *M. & S.* 581; Kane *v.* Hood, 13 *Pick.* 282; Broughton *v.* Conway, *Platt on Covenants* 138; Griffith *v.* Goodhand, *T. Raym.* 464; *Skin.* 40; 1 *Sheph. Touch.* 82, 83; Shrewsbury *v.* Gould, 2 *B. & Ald.* 487; Webb *v.* Plummer, *Id.* 746; St. Albans *v.* Ellis, 13 *East* 352; Miles *v.* Stevens, 3 *Barr* 21; Parker *v.* Smith, 17 *Mass.* 413; Selden *v.* Williams, 9 *Watts* 9; Dailey *v.* Beck, *Brightly* 107; Lewis Street, 2 *Wend.* 472; Lehigh Coal and Navigation Co. *v.* Harlan, 3 *Casey* 430; Miller's Appeals, 6 *Id.* 478.

*M. Goepp, A. E. Brown,* and *Mallery,* for the defendants in error.

The opinion of the court was delivered by

LOWRIE, C. J.—We regard this coal lease as a grant of an interest in land, and not as a mere license to take coal: 7 *Casey* 477. The question is, did the lessors warrant that there was coal in the supposed veins, and if so, what were the terms of the warranty? We do not imply a warranty that the property demised is fit for the purposes for which it is demised: 2 *Casey* 117; but it is insisted, that a warranty is involved in the nature of the grant and of its terms, as expressed in the lease; and that, not the ordinary warranty of grants of real estate, which is measured by the consideration paid; for that would be of no profit to the lessees here. Whatever be its character, it must be a warranty that is definite in its terms; else it furnishes no measure of the plaintiff's rights, and, as a contract, cannot be enforced. Therefore, a warranty even that there were coal veins, or that there was some

[Harlan *et al. v.* The Lehigh Coal and Navigation Company.]

coal in the veins, would not answer the purpose; for, if there had been found some coal there, it would not have prevented their complaints, if the veins had not been worth working. The plaintiffs must, therefore, be understood as insisting upon a warranty of sufficient coal to compensate them for their outlay in reaching it, or in mining for it, for that alone could be of use to them. Is such a warranty involved in this contract of lease? We think not.

Undoubtedly, the court will construct a warranty or other contract where none is in terms expressed by the parties, if our common sense of justice requires it, and it is essential to complete the definition of the relation plainly intended to be established between the parties, and if its terms can be clearly deduced from the instrument, and from the nature of the transaction. The cases cited for the plaintiffs abundantly illustrate this principle, and we may test this case by it.

We do not discover that there is any unexpressed term of this contract, which common justice requires us to supply, or any that is necessary to complete the definition of the relation intended to be established. We have already sufficiently indicated our opinion, 3 *Casey* 439, that the expense of a fruitless search for these veins was not intended to be charged to the lessors; and, of course, we cannot construct any such a warranty. It was undoubtedly coal veins that were intended to be leased, and if the parties were mistaken about the fact, the result would be a right to dissolve the contract, and not a right to have a different contract in its stead. It is quite apparent, that the R. and S. veins were known subjects of contract, that they were supposed to exist in the lessor's land as they did elsewhere, and that the lease was intended as a grant of the right to find and work them. But we have nothing that entitles us to construct a warranty that the lessees should be able to find and work them.

Judgment affirmed.