145    1
144   587

145       1
p 26 SC 141
p 26 SC 142

145       1
213    1  31

145       1
f221   1417

145    1
41SC1  11

## ESTATE OF THOMAS LAZARUS, DECEASED.

APPEAL BY G. LAZARUS ET AL., EXRS. OF R. LAZARUS, DE-
CEASED, FROM THE ORPHANS' COURT OF LUZERNE COUNTY.

Argued April 14, 1891—Decided January 4, 1892.

(*a*) A grantor "demised and leased" all the anthracite coal under certain
lands, with the privilege of mining and removing the same; the grant-
ees "to have and to hold the said anthracite coal . . . . . for and dur-
ing the term of ninety-nine years," and to pay a fixed rate per ton for
coal mined, but not less than a stipulated sum each year:

1. The transaction constituted a sale of the coal, giving to the grantees
an absolute and exclusive right to take all the available coal in the tract
described; and it was immaterial that the consideration, beyond the
stipulated sum payable in any event, was regulated by the rate per ton
for the coal which might be mined.

2. Nor was it material, in such case, that no coal might be mined from
the tract in the lifetime of the grantor, nor in the entire term provided
for; and "rentals" maturing after the death of the grantor were pay-
able as purchase money to his administrators, and distributable as per-
sonalty to those entitled thereto.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WIL-
LIAMS, JJ.

Statement of Facts.

No. 85 January Term 1891, Sup. Ct.; court below, number and term not shown.

On November 2, 1889, George Lazarus and Chester B. Lazarus, administrators of the estate of Thomas Lazarus, deceased, filed their first and partial account, in which they charged themselves with "purchase moneys received" under a certain so-called lease of coal lands dated April 13, 1871, hereinafter mentioned, the said amounts being as follows:

| | |
|---|---:|
| Amount received January 22, 1889, . . | $1,645 |
| Amount received April 12, 1889, . . . | 1,645 |
| Amount received July 15, 1889, . . . . | 1,645 |
| Amount received October 14, 1889, . . . | 1,645 |
| | $6,580 |

To the said account certain of the heirs at law of the decedent filed exceptions, alleging, inter alia, that the accountants should not have embraced either of said four items in their account, because, being rents accruing from said coal-lease, the items were not collectible by the accountants, and they improperly charged themselves with them. Thereupon *Mr. Joseph D. Coons* was appointed auditor, " to report on exceptions and make distribution after taking testimony."

On May 12, 1890, the auditor filed a report finding in substance the following facts:

In 1871, Thomas Lazarus, the decedent, was the owner of 105 acres and 121.8 perches of land in Hanover township, underlaid with anthracite coal. Adjoining this tract were 20 acres 114 perches owned by John Lazarus; 34 acres 107 perches owned by A. B. Blodget and Mary, his wife; and 63 acres 139 perches owned by Richard Gunton; all underlaid with coal. On April 13, 1871, said owners, including the decedent, as parties of the first part entered into an "indenture of lease" with William Downs and John Dennis, as parties of the second part, the portions thereof, treated as material in the court below, providing:

" That the said parties of the first part, for and in consideration of the yearly rents, covenants and agreements hereinafter mentioned and reserved on the part and behalf of the said parties of the second part, their executors, administrators and as-

Statement of Facts.

signs, to be paid, kept and performed, have demised and leased, and by these presents do demise and lease unto the said parties of the second part, their executors, administrators and assigns, all the anthracite coal on and under the following described contiguous tracts of land, situate in the said township of Hanover, with the privilege of mining and removing the same, and bounded as follows : . . . . Which said land is held in fee by the lessors above named, in severalty, in the following proportions, viz.: . . . . . The quantity and boundaries of the respective land of each one is laid down upon the said accompanying draft, and hereto attached and made a part of this lease as aforesaid.

" To have and to hold the said anthracite coal upon and under the said described tract of land of two hundred twenty-five acres and two perches, with the right and privilege of mining and removing the same, unto the said parties of the second part, their executors, administrators and assigns, from the first day of April instant, for and during the term of ninety-nine years ; and fully to be complete at and ended on the first day of April in the year nineteen hundred and seventy (1970). . . . .

" 1. The said parties of the second part shall pay the said parties of the first part, twenty-five cents for every ton of 2240 pounds of merchantable coal mined upon the leased premises, that will pass over a screen of five eighths of an inch mesh ; the rent to be paid quarterly in each year, during the term, or so long as there may be coal available to mine, on the first days of July, October, January and April, for all coal mined in each year. But, during the second year of this lease, the sum to be paid shall not be less than sixteen hundred dollars ; during the third year, not less than five thousand seven hundred dollars ; during the fourth year, not less than eleven thousand three hundred dollars ; and during the fifth year, and every subsequent year of the term, not less than fourteen thousand dollars ; these annual sums to be paid whether coal shall have been mined in sufficient quantities, at the rate of twenty-five cents per ton, to make them up or not ; with the proviso, however, that coal is to be found upon the premises, and can be reached with proper energy and perseverance. But, should the said parties of the second part, in any one year pay for more coal than they shall have mined, they make up the deficiency in any subsequent year of the term of this lease ; . . . .

Statement of Facts.

" 2. The mining shall be conducted in a judicious and skilful manner, and all the merchantable coal in any seam they may operate, shall be removed as they advance, leaving sufficient supports for the roof, and conducting the business with care and upon the most improved principles of mining."

" 4. The parties of the second part, shall have the privilege to make air shafts upon the surface at such places as may be most proper; but not in any case to interfere with any tenement or buildings, using as little space as may be practicable, and paying the owner a fair compensation for such surface ; and on failure to fix that sum with such owner, it shall be submitted to an umpire to determine."

" 6. The said parties of the second part shall pay during the continuance of this lease, all taxes, imposts or excises laid upon the coal mined, or not mined, either by state or national laws, or upon the product of the mines, or in any manner. whatever connected with mining operations."

" 8. The parties of the second part may assign this lease, or sub-let the same ; but no further assignment or sub-letting shall be made by their assignees or sub-tenants, without the written consent of the parties of the first part having been first obtained.

" 9. The parties of the second part shall be liable for the payment of rent as hereinbefore named until all the available merchantable coal shall be mined upon the premises, and when this shall have been done this lease shall be ended though the time may be less than that specified in the term named.

" 10. Should the said parties of the second part fail at any time to meet the regular quarterly payments at the time the same shall become due and payable, or at the end of sixty days thereafter, all their rights and privileges under this lease shall cease and determine, and the premises shall be surrendered up to the lessors. But such forfeiture shall be a matter within the discretion of the lessors, and the said lessors may, in either case, enforce collection of rent in arrear, by the ordinary process of levy and sale by landlord's warrant. Should the said parties of the first part, for failure to pay rent as aforesaid on the part of the parties of the second part, conclude to forfeit the lease, and put an end to the same, they shall notify the said parties of the second part of such intention, . . . .

" 11. The parties of the first part shall be entitled to rents

Statement of Facts.

paid in proportion to the quantity of acres of land of which each is the owner, whether the coal be mined upon the land of one or another. For the purposes of this lease, the interest of each one is consolidated in a general aggregate, and neither without the joinder of all shall sell or dispose of the coal under or upon his particular estate. All the coal is for the benefit of all the said parties, upon the whole of the said premises, in the proportion, as to acres, as heretofore named; and the same is to so remain whether this lease be terminated or not; with this understanding, however, that should this lease be terminated and ended before any coal shall have been mined, upon any part of the premises, then the interest of each one of the said parties of the first part, shall revert to him, and their several rights and interests shall be the same as though this lease had never been made."

The foregoing indenture was duly acknowledged and recorded on April 17, 1871. By subsequent assignments the interests of the parties of the second part therein became vested in the Lehigh & Wilkes-Barre Coal Company. During the lifetime of Thomas Lazarus he was paid under the provisions of said indenture a sum approximating forty-four thousand dollars, but up to the time of the audit no coal had been mined from the lands described in the indenture. Thomas Lazarus, the decedent, died intestate on December 13, 1888, leaving to survive him a widow, Rachel Lazarus, two sons, George and Chester B. Lazarus, and five married daughters. Letters of administration on his estate were issued to George and Chester B. Lazarus on December 18, 1888.

Rachel Lazarus, the widow, died on July 30, 1889, leaving a will dated January 18, 1889, duly admitted to probate, whereby she bequeathed and devised all her estate, real and personal, to her two sons, George and Chester B. Lazarus. Letters testamentary upon her estate were issued to George and Chester B. Lazarus, her executors, on September 17, 1889.

George Lazarus and Chester B. Lazarus, executors of the will of Rachel Lazarus, deceased, presented for allowance a claim of $2,675, with interest. Evidence was submitted tending to show that about 1855, Rachel Lazarus inherited from the estate of her father between $1,600 and $1,700, which sum went into the hands of the decedent, and, with its accumulations to the

year 1883, amounted to near $3,000. Of this money, the decedent, on November 1, 1883, invested $2,675 in a lot of ground in the borough of Nanticoke, taking the title in the name of his wife Rachel. This investment, for reasons stated, yielding no profit to Mrs. Lazarus, in 1888 the decedent, desiring to satisfy his wife and put her funds in a more profitable shape, agreed with her to take the Nanticoke property from her and to pay her for it in money. Pursuant to this agreement Mrs. Lazarus, by assignment dated June 27, 1888, conveyed the lot to Mr. G. M. Harding, who by assignment of the same date conveyed it to Thomas Lazarus. The considerations expressed in these assignments were one dollar, but no money was then or subsequently paid to Mrs. Lazarus by the decedent.

Upon the question whether the indenture of April 13, 1871, was a lease, or a sale of the coal in place, so that the sum of $6,580 covered by the four items in the account was to be regarded as rent issuing out of the coal estate in the decedent at the time of his death, or as purchase money for real estate sold by him in his lifetime, the auditor, discussing Caldwell v. Fulton, 31 Pa. 475 ; Sanderson v. Scranton City, 105 Pa. 469 ; Del. etc. R. Co. v. Sanderson, 109 Pa. 583 ; Hope's App., 33 Pittsb. L. J. 320 (2 Cent. R. 43; 3 East. R. 278; 29 W. N. 365); Fairchild v. Fairchild, 7 Cent. R. 873 ; Montooth v. Gamble, 123 Pa. 248 ; Duff v. Hopkins, 12 Cent. R. 545 (21 W. N. 491) , reported that said sum of $6,580 was to be regarded as purchase money of real estate sold by Thomas Lazarus in his lifetime, to be distributed as personal estate, and that the exception to these items should be dismissed. As to the claim presented by the executors of Rachel Lazarus, deceased, the auditor reported that it was established as valid, and with interest from June 27, 1888, amounted to $2,975.93, which should be paid out of the fund.

To a distribution reported according to the foregoing findings, exceptions were filed alleging error in the auditor's rulings as to the items of the account excepted to, and to the allowance of the said claim of the estate of Mrs. Rachel Lazarus. Said exceptions having been argued, the court, RHONE, P. J., on October 13, 1890, filed an opinion holding in substance: (1) That the indenture of April 13, 1871, was in law a lease of the underlying coal, and not a sale of it ; and therefore, the moneys aris-

ing under it were not purchase moneys, but rents, and as such not properly receivable by the administrators, or chargeable in their account. (2) That there was a want of sufficient evidence to establish the claim presented by the executors of Rachel Lazarus, as a liability of the estate of Thomas Lazarus. The exceptions to the report were therefore sustained, and a decree of distribution entered accordingly. Thereupon, George Lazarus and Chester B. Lazarus, executors of the will of Rachel Lazarus, deceased, took this appeal, specifying the sustaining of the exceptions to the report and the decree entered, for error.

*Mr. John S. Harding, Mr. C. F. Bohan* and *Mr. Garrick M. Harding,* for the appellants.

*Mr. L. H. Bennett* (with him *Mr. A. R. Brundage*), for the appellees.

OPINION, MR. JUSTICE STERRETT:

The conveyance made by Thomas Lazarus is not distinguishable either in form or in purpose from that which was the subject of construction in Hope's App., 33 Pittsb. L. J. 320; and which was held to constitute a sale of the coal. They are both in form leases for a term of ninety-nine years; both give the grantees an absolute and exclusive right to take out all the available coal in the tracts described; and both exact the payment of a stipulated sum, without regard to whether coal shall be taken out or not within that period. It is obviously immaterial that in Hope's Appeal the consideration is payable in solido, while here the consideration, beyond the stipulated sum payable in any event, is regulated according to the rate per ton for the coal which may be mined; for this is simply a difference in the mode of payment of such consideration. Nor is it material that no coal has been nor may be mined within the term specified. The grantee has the absolute and exclusive right, under the conveyance, to mine all the available coal contained in the tract described, and it rests with him alone whether or not there shall be a reversion. If he should exercise his right within the term, the coal will by severance have become absolutely his, and his grantor will have received its equivalent in cash as in the case of an ordinary sale; if not,

his inaction will simply amount to a voluntary forfeiture of such rights. As was said in Hope's App., " The grant of a right to mine coal in the lands of the lessor and remove it therefrom, although the instrument may be called a lease, is a grant of an interest in the land itself, and not a mere license to take the coal." The transaction here constituted a sale of the coal conditioned upon its being removed within the period specified; and the court below was therefore in error. See Kingsley v. Coal & I. Co., 144 Pa. 613.

So, the court was in error in rejecting the claim on behalf of the estate of Rachel Lazarus, deceased. It is conceded that the Nanticoke house and lot was her separate estate when conveyed to her husband; and the auditor has found ·upon sufficient evidence that the consideration of this conveyance was in fact $2,975.93, and remains due and unpaid.

Decree reversed; and it is now adjudged and decreed that the fund be distributed in accordance with the schedule of distribution submitted by the auditor, and that the costs of this appeal be paid by the appellees.