# Hummel, Appellant, *v.* McFadden.

544

Argued March 18, 1959. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and McBride, JJ.

*William C. Robinson,* with him *Henninger & Robinson,* for appellants.

*Luther C. Braham,* with him *Darrell L. Gregg, Richard B. Kirkpatrick, Norman D. Jaffe,* and *Galbreath, Braham, Gregg, Kirkpatrick & Jaffe,* for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 8, 1959:

In this equity suit the appellants seek the partition of *both* the surface and the coal of a large tract of land situated, in greater part, in Butler County and, in smaller part, in Mercer County.

In 1910 one Tifney McFadden conveyed this entire tract of land, including, both surface and coal, to six sisters surnamed Buchanan. Subsequently, two of these sisters died; upon their deaths, their respective interests in both the surface and coal of this tract became vested in their four surviving sisters, two of whom married (Mary Buchanan McFadden and Isabella Buchanan Stillwagon) and two remained single (Hannah and Harriet Buchanan).

On June 2, 1934 three of the sisters conveyed to the fourth sister, Mary McFadden, the surface of the northern 47 acres of the tract, the grantors reserving however all their interests in the coal underneath these 47 acres. On the same date, the two married sisters,—Mary McFadden and Isabella Stillwagon,

joined by their spouses, conveyed the surface of the southern 47 acres of the tract to their two spinster sisters as joint tenants with right of survivorship, the grantors reserving all their interests in the coal underneath these 47 acres.

On June 5, 1934 *all* four Buchanan sisters (the married ones being joined by their spouses)—representing the *entire* ownership of the coal under the entire tract—entered into a written agreement with Ralph McFadden, an appellee, for the mining and removal of the coal under 15 acres of the easterly section of the northern 47 acres.

Three years later Hannah Buchanan died, her interest in the coal or the proceeds therefrom becoming vested in her three surviving sisters. On May 2, 1940 Isabella Stillwagon died survived by her husband and six children; on the husband's death on March 14, 1945 Mrs. Stillwagon's entire interest in the coal or the proceeds therefrom vested in her six children.

On August 31, 1945 *all* parties with any interest in the coal under the entire tract of land entered into another written agreement with Ralph McFadden for the mining and removal of the coal lying under the balance of the entire tract not covered in the 1934 mining agreement.

Subsequently the appellants acquired whatever interest certain of the Stillwagon children had in the surface and coal of this tract.

On February 19, 1951 appellants instituted the present proceeding the purpose of which is to partition *both* the surface of and the coal under the entire tract. After issue was joined in the pleadings, between 1951 and 1954, several hearings were held before the then President Judge of Butler County, W. B. PURVIS. Unfortunately the notes of testimony taken at these hearings became unavailable and finally the matter was

heard *de novo* before President Judge CLYDE S. SHUMAKER. Upon completion of the testimony, *the court granted partition of the surface but denied partition of the coal under the entire tract of land.* From that decree this appeal was taken.

This appeal poses two issues: (1) under the 1934 and 1945 mining agreements between the Buchanans[1] and Ralph McFadden, did the latter acquire ownership in fee simple of the coal in place?; (2) if he did, has his right of ownership been lost by reason of abandonment, non-user or forfeiture?

Under the 1934 agreement all "that certain tract of land" containing "15, more or less, acres" (described by adjoinders) located in the northern portion of the tract was "lease[d] and let" for the "purpose of mining and removing coal therefrom"; the habendum clause provided that McFadden was "to have and to hold said land" for "purpose[s] of mining and removing coal" for an unstated term,[2] and "so much longer as coal is mined and removed in paying quantities"; the agreement further provided: ". . . it being agreed and understood that at least — tons of coal shall be mined and removed each year or in case that amount is not mined in any year this lease shall become null and void"; payment was to be made to the "Buchanans" on the basis of "fifteen percent of all money received for coal, settlements to be made monthly for all coal mined and removed"; the mine was to be operated in a "workmanlike manner." Moreover the agreement states "as long as [McFadden] is operating said mine no lease for coal will be given to other parties for other land adjoining this lease."

---

[1] The term "Buchanans" includes all those holding "Buchanan" interests.

[2] The actual provision read "for and during the term of — years from date hereof . . ."

According to its terms, therefore, the 1934 agreement was exclusive, the coal was to be paid for on a monthly basis *when* the coal was mined and removed and no *express* obligation was imposed on McFadden nor did he *expressly* covenant to mine and remove the coal with due diligence.[3]  The only sanction open to the Buchanans under the agreement was implied: if McFadden did not operate the mine Buchanans could lease the adjoining land to other parties for mining purposes.[4]  It is evident that Buchanans originally intended the life of the agreement to be measured by a definite number of years plus a time thereafter during which the coal could be mined and removed profitably; their failure to insert in the agreement the actual number of years removed the minimum limitation of time from the agreement and had the effect of granting the right to mine the coal to exhaustion.  The obligation of McFadden to mine in a "workmanlike manner" went to the *manner* of, rather than *diligence* in, mining.

Under the 1945 agreement the Buchanans agreed to "lease" to McFadden "all the coal" under the balance of the Buchanan tract (described by adjoinders), over and above the 15 acre tract covered in the 1934 agreement, "with the full, perpetual and exclusive right" to mine and remove the coal.  McFadden was to pay "a royalty of fifteen per cent of all moneys received from sale of said coal, the maximum royalty however not to exceed thirty five cents per ton.  Payments for said coal to be made monthly."

---

[3] Buchanans must have had the imposition of this obligation in mind; their failure to state the annual minimum yearly tonnage required or to impose a minimum royalty nullified this intent.

[4] From 1934 to 1945 the Buchanans must have been satisfied with McFadden's operation of the mine because in the latter year they gave *him* a lease for mining purposes of their adjoining lands.

The 1945 agreement was not only exclusive but, by its very terms, the grant of a right to mine in perpetuity. Even though payment for the coal was on a monthly tonnage basis, the right given to McFadden was to mine the coal to exhaustion. Like the 1934 agreement, this agreement failed to provide for payment of any annual minimum royalty or for an annual minimum tonnage and imposed no *express* obligation on McFadden to mine with due diligence.

Under these facts did either or both mining agreements pass a title in fee simple in the coal to McFadden and constitute a sale or sales of the coal in place?

As early as 1853 this Court recognized, in effect, that an unrestricted right to take and carry away all the coal under a tract of land constituted a corporeal right: *Benson v. The Miners' Bank*, 20 Pa. 370. *Caldwell v. Fulton*, 31 Pa. 475[5] is the landmark decision on the interpretation of a mining agreement as a sale of coal in place. The facts therein were: Caldwell, from whom the plaintiff Caldwell derived his title, in consideration of $1800, conveyed to one Greer, his heirs and assigns, 2 parcels of land (described by metes and bounds) one a 6 acre parcel and the other a 10 acre parcel. The words of conveyance were: "Also, the full right, title and privilege of digging and taking away stone coal, to any extent [Greer] may think proper to do, or cause to be done, . . ." under Caldwell's land. Eleven years later Greer conveyed an undivided one-half of the premises to one Case and the other one-half to one McCune. Two years later Case conveyed to McCune his interest which McCune later conveyed to one Bell. Four years later Bell and McCune partitioned among themselves the entire 16

---

[5] This case reviewed a previous decision of this Court by Mr. Justice WOODWARD in *Caldwell v. Greer*, reported in 31 Pa. 476.

acres together with the coal thereunder. Four years later McCune "leased" both his land and coal to Fulton and the latter began digging for coal. Caldwell sued Fulton in trespass for removing coal from the Caldwell land. The court below held that Caldwell's deed to Greer did not constitute a grant of the fee in the coal. Mr. Justice STRONG, speaking for this Court, thus analyzed the Caldwell-Greer deed: (1) in the description of the grant no limits were fixed upon the extent to which coal might be taken and Greer's right to take the coal was "coextensive with his will"; (2) in view of the law's recognition that one man may own the surface and another the mineral rights, both are landowners and both are holders of a corporeal hereditament, coal and minerals in place being considered land; (3) there are two methods in which the subject matter of a deed may be described; (a) by a description of the land itself (as by metes and bounds or by name) and (b) by a designation of the usufruct or dominion over the subject matter—"the grant of a thing can be no more than the grant of the full and unlimited use of it"; (4) the description of the coal in this deed by the designation of Greer's dominion over it and by the conveyance of the whole use of the coal and the absolute dominion over it amounted to a grant of the coal itself; the language of Caldwell's deed to Greer expressed absolute dominion and complete enjoyment over the coal, "He [Greer] could take out coal to any extent. He could cause it to be taken out to any extent, and at all times under any of the land. He was accountable to no one . . . but the right to take the coal itself was absolutely unlimited."

The importance of *Caldwell* lies not only in its actual ruling but in its implications. Mr. Justice STRONG, in distinguishing decisions in other cases, particularly of the English courts, noted that (a) if the

grantee's right to remove coal was only for a limited purpose, such as his own fuel, such limited right negatives the "exclusiveness" essential to a sale of coal in place; (b) if the coal was to be paid for by grantee *only* when mined and taken from the ground on the basis of each ton *taken*, then an element of a sale is lacking in that no consideration would have passed and there was no obligation nor undertaking on grantee's part to "search for or take any [coal]." The test enunciated in *Caldwell*—long and well recognized—is that when "the intent [of the agreement] is to give the entire usufruct and power of disposal [of the coal], the legal title must be held to pass"; otherwise, not.

Subsequent to *Caldwell* our Court followed its implications and denied the existence of a sale of coal in place when the agreement imposed no obligation nor contained any express covenant to mine and remove the coal with due diligence and payment was to be made on a tonnage basis only when and if the coal was removed, or the right to mine the coal was conditioned on its use for a specific purpose.[6]

These subsequent decisions eventually solidified the test to be applied to determine whether or not an agreement constituted a sale of coal in place into three general principles: (1) the right had to be exclusive in the vendee; (2) to mine all the coal; (3) and he must have paid either a stipulated consideration, or have been compelled to mine, or what

---

[6] *The Johnstown Iron Co. v. The Cambria Iron Co. et al.*, 32 Pa. 241; *Clement & Masser v. Youngman & Walter*, 40 Pa. 341; *Funk v. Haldeman et al.*, 53 Pa. 229; *Gloninger et al. v. The Franklin Coal Co. et al.*, 55 Pa. 9; *Grove v. Hodges*, 55 Pa. 504; *Neumoyer et al. v. Andreas*, 57 Pa. 446; *Grubb v. Grubb*, 74 Pa. 25; *Jennings Bros. & Co., Ltd. v. Beale*, 158 Pa. 283, 27 A. 948.

is the same thing, pay for the coal if not mined.[7] This criterion remained substantially unchanged until the case of *Smith v. Glen Alden Coal Co.*, 347 Pa. 290, 301, 32 A. 2d. 227, when Mr. Chief Justice MAXEY restated the rule to read "that the lease of coal in place with the right to mine and remove all of it for a stipulated royalty vests in the lessee a fee." No mention was made, however, of whether or not the lease in the *Smith* case required the removal of a minimum amount of coal per year or provided for the payment of a minimum royalty even if no coal was mined. Although, at first blush, the test thus laid down would seem to have ignored the third principle initially enunciated, namely, that a stipulated consideration must have been paid or that the agreement must have contained an express provision requiring the mining or removal of coal in order to constitute a sale of coal in place, an examination of a related doctrine, apparently overlooked by earlier decisions, refutes this belief. It has long been the rule in this state that the law wisely implies, even in the absence of any express

---

[7] *Harlan v. Lehigh Coal & Navigation Co.*, 35 Pa. 287; *Pennsylvania Salt & Mfg. Co. v. Neel*, 54 Pa. 9; *Briggs v. Davis*, 81* Pa. 470; *Sanderson v. Scranton*, 105 Pa. 469; *D. L. & W. R. R. Co. v. Sanderson*, 109 Pa. 583, 1 A. 394; *Hope's Appeal*, 1 Sadler 307, 3 A. 23; *Brown v. Beecher et al.*, 120 Pa. 590, 15 A. 608; *Montooth v. Gamble*, 123 Pa. 240, 16 A. 594; *Fairchild v. Dunbar Furnace Co.*, 128 Pa. 485, 18 A. 443; *Lillibridge v. Lackawanna Coal Co.*, 143 Pa. 293, 22 A. 1035; *Kingsley v. Hillside Coal & Iron Co.*, 144 Pa. 613, 23 A. 250; *Lazarus Estate*, 145 Pa. 1, 23 A. 372; *Plummer v. Hillside Coal & Iron Co.*, 160 Pa. 483, 28 A. 853; *Powell v. Lantzy*, 173 Pa. 543, 34 A. 450; *Lehigh Coal Co. v. Wright*, 177 Pa. 387; 35 A. 919; *Robinson v. Pierce*, 278 Pa. 372, 375, 376, 123 A. 324; *Sturdevant v. Thomson*, 280 Pa. 233, 124 A. 434; *Westbrook Coal Company v. Hudson Coal Co.*, 352 Pa. 371, 42 A. 2d 825; *Commonwealth v. Solley*, 384 Pa. 404, 121 A. 2d 169; *Boron v. Smith*, 380 Pa. 98, 110 A. 2d 169; *City of Pittsburgh v. Pa. P. U. C.*, 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607.

covenant, *a covenant to mine and remove the coal with due diligence*: *Watson v. O'Hern*, 6 Watts, 362; *Lyon v. Miller*, 24 Pa. 392; *Koch's & Balliet's Appeal*, 93 Pa. 434, 442; *Ray v. Western Penna. Natural Gas Co.*, 138 Pa. 576, 589, 20 A. 1065; *Hill v. Joy*, 149 Pa. 243, 246, 24 A. 293; *Chauvenet v. Person*, 217 Pa. 464, 468, 66 A. 855; *Penrose et al. v. Coal Co. et al.*, 289 Pa. 519, 523, 137 A. 670. In the absence of any express covenant or obligation to mine with due diligence or of any minimum royalty provision, the lessors-grantors find themselves in the position wherein they have parted with title to the coal without having provided, through inadvertence, ignorance or improvidence, an obligation on the part of the lessee-grantee to actually mine and remove the coal and thus secure payment for the coal granted. If it were the law that the absence of either or both provisions leaves the lessors-grantors without any redress a grave injustice would result not only to them but also to the public interest which is concerned with the development of the natural resources of the state. The third requirement originally set forth, therefore, loses its significance when viewed in the light of the implied but nonetheless well-recognized and accepted requirement to mine with due diligence. Later decisions, moreover, have squarely placed the determination of the existence of a sale of coal in place on the language of the mining agreement rather than upon the existence of a definite term, lack of obligation or covenant to mine, or provision for payment on a tonnage basis as factors decisively negativing the existence of a sale of the coal in place.

Not *every* agreement for the mining of coal, however, amounts to a sale of the coal in place. "A contract regarding coal in place may be a sale absolute, a conditional sale, a lease in the ordinary accept[ance] of that term, or a mere license to mine and remove the

minerals: [citing cases]": *Girard Trust Co. v. Delaware & Hudson Company,* 246 Pa. 161, 166, 92 A. 129. An examination of our decisions will indicate that following *Caldwell* some decisions appear to cast further doubt on the integrity of the rule "that the lease of coal in place with the right to mine and remove all of it for a stipulated royalty vests in the lessee a fee": *Smith v. Glen Alden Coal Company,* 347 Pa. 290, 301, supra. In *Gallagher v. Hicks,* 216 Pa. 243, 65 A. 623, the Court said (p. 245): ". . . an unfortunate expression in the opinion [Hope's Appeal, 1 Sadler 307] has been the starting point of a tendency to class together *all* contracts about coal in place as absolute sales without due regard to each particular contract and the obligation to interpret it by its own terms and intent. What Denniston v. Haddock [200 Pa. 426] and the cases which have followed it did was to check the tendency to indiscriminate lumping of all such contracts together and to recall in regard to them the true principles of construction applicable alike to all contracts." See also: *Coolbaugh v. Lehigh & Wilkes-Barre Coal Co.,* 213 Pa. 28, 62 A. 94; *Burke et ux. v. Kerr,* 142 Pa. Superior Ct. 37, 15 A. 2d 685. Mr. Chief Justice MAXEY, speaking for the Court in *Smith v. Glen Alden Coal Co. et al.,* 347 Pa. 290, 301, supra, said: "These decisions [Denniston v. Haddock, supra; Coolbaugh v. Lehigh & Wilkes-Barre Coal Co., supra; Gallagher v. Hicks, supra; Burke et ux. v. Kerr, supra;] are out of line with the rational foundation of those decisions which have established the rule in Pennsylvania . . ." An examination of the opinion in *Smith* reveals that the writer of that opinion believed that the decisions named were "out of line" insofar as they manifested any reluctance to accept the rule with all its logical deductions that a lease of all the coal in place *could* amount to a conveyance of the fee in the coal and that no in-

terest in the coal as real property would remain in the lessor except the possibility of a reverter. *Smith,* however, does not hold that the named decisions were "out of line" in so far as they held that each mining agreement must be judged *sui generis* in order to determine the extent to which the parties have bargained. While a mining agreement may amount to a conveyance and sale of the coal in place, by the same token there can be mining agreements which grant less than a fee in the coal in place.

In the light of these principles we examine the two mining agreements presently involved to determine whether they, or either of them, did convey a fee simple title in the coal to McFadden. While both agreements purport to *"lease"* the coal and are in the form of leases, such fact is not material, the *character* of the transaction being controlling: *D. L. & W. R. R. Co. v. Sanderson,* 109 Pa. 583, 1 A. 394; *Plummer v. Hillside Coal & Iron Co.,* 160 Pa. 483, 28 A. 853; *Shenandoah Borough v. Philadelphia,* 367 Pa. 180, 186, 79 A. 2d 433. In the 1934 agreement the term is so long "as coal is mined and removed in paying quantities", while in the 1945 agreement the right to mine the coal is "perpetual."[8] Neither agreement contains a minimum royalty; the consideration for both agreements is the payment of a tonnage royalty payable when the coal is sold, not when mined. Neither agreement contains an express covenant upon the part of the grantee-lessee to mine with due diligence, but the law supplies

[8] Even though there had been a definite term expressed in the agreement such fact would not control. ". . . and the fact that the right to take is limited to a term of years, does not make it any the less a sale": *Advance Industrial Supply Co. v. Eagle Metallic Copper Co.,* 267 Pa. 15, 20, 109 A. 771. See also: *Kingsley v. Hillside Coal & Iron Co.,* 144 Pa. 613, 628, supra; *Shenandoah Borough v. Phila.,* 367 Pa. 180, 186, 187, supra, and cases therein cited.

such omission. The important feature is that neither agreement imposes any limitation in respect to the time, the quantity or the purpose of removal of the coal nor upon the person who is to remove the coal; both agreements give McFadden full and complete dominion over the coal until the exhaustion thereof. Both agreements clearly are sales of the coal in place. McFadden's title to the coal is in fee simple; such title is paramount to and must prevail over appellants' rights unless McFadden in some manner has forfeited his rights.

A corporeal hereditament cannot be the subject of abandonment: 1 C.J.S. Abandonment 13, Sec. 5(c); Thompson, Real Property, Vol. 5, p. 313, §2567; *Graham & Co. Inc. v. Penna. Turnpike Commission*, 347 Pa. 622, 635, 33 A. 2d 22. As coal is a corporeal hereditament (*Lillibridge v. Lackawanna Coal Co.*, 143 Pa. 293, supra) there can be no abandonment of the title to coal, although adverse possession, if proven, may divest the title. As Mr. Justice (later Chief Justice) HORACE STERN stated in *Indiana County Petition*, 360 Pa. 244, 248, 249, 62 A. 2d 3 (wherein it was contended, inter alia, that a mining company by its failure to conduct mining operations for 13 years and to pay taxes over a longe course of years had abandoned its title): "It has frequently been held that abandonment of title is not to be presumed from a mere failure to possess the land or from neglect to pay taxes thereon; inchoate rights may be abandoned but abandonment is not predicable of perfect titles [citing cases]." In *Parks v. Pa. RR. Co.*, 301 Pa. 475, 481, 152 A. 682 it was said: " 'A perfect title passing by the Commonwealth's patent . . . is in no danger from the doctrine of abandonment, unless, in consequence of [the] abandonment, adverse possession is taken by another and held for the period of the statute of limitations.' " See also:

*Kreamer v. Voneida,* 213 Pa. 74, 62 A. 518; *Graham & Co. v. Penna. Turnpike Commission,* 347 Pa. 622, 635, 636, supra.[9]

Mr. Justice DEAN in *Huss v. Jacobs,* 210 Pa. 145, 161, 59 A. 991, aptly said: "To preserve such a title [a title in fee simple to coal] the law does not require physical possession by the owner, that he should live in a coal mine": *Muzzio et al. v. Steele,* 279 Pa. 226, 123 A. 776. In *Pope v. McMichael,* 165 Pa. Superior Ct. 264, 267, 67 A. 2d 633 the Superior Court stated: "And if there was remaining coal in the vein which could be mined, the fact that plaintiff's immediate predecessor had ceased to work it did not result in an abandonment of its estate in the coal and a return of it to the surface owner. It is unimportant that plaintiff, after the conveyance to him, did not assert by actual possession or other physical means, his purpose to mine out the rest of the coal." Defeat of McFadden's title to the coal in either tract cannot be accomplished by any theory of abandonment, a theory inapplicable to defeat a perfect title.[10]

Neither of the instant agreements contain any express covenant or obligation on the part of McFadden that he mine and remove the coal with due diligence, nor any minimum royalty provision the effect of which would be to assure the Buchanans of at least a nominal return by way of consideration even though McFadden failed to mine with due diligence or did not

[9] Abandonment is a question of intention to be determined from the facts. It differs from a surrender in that there is no express holding which is possessed by the lessee and it differs from a forfeiture in that it is based on an intentional relinquishment of rights by the lessee, and not upon a breach of obligation. See: *Girolami v. Peoples Natural Gas Co.,* 365 Pa. 455, 460, 76 A. 2d 375; *Aye v. Philadelphia Co.,* 193 Pa. 451, 44 A. 555.

[10] See: *O'Dwyer v. Ream,* 390 Pa. 474, 485, 136 A. 2d 90, and cases therein cited.

mine at all. When the Buchanans and McFadden entered into these agreements, however, McFadden impliedly covenanted that he would mine and remove the coal with due diligence. That does not mean continuous mining: *Owens v. Thompson,* 385 Pa. 506, 511, 512, 123 A. 2d 408; *Kittaning Coal Company v. Moore,* 362 Pa. 128, 132, 66 A. 2d 273. What due diligence does mean will depend upon the circumstances; the quantity and quality of the coal, the fluctuating market demand, the labor market, the accessibility of the coal and many other factors. The determination whether mining has been diligently pursued must depend upon the facts of each case.

McFadden had the implied obligation to mine this coal with due diligence both under the 1934 and 1945 agreements. It would serve no useful purpose to examine all the facts of record bearing on this question. Sufficient it is to state that our examination of the record indicates no lack of due diligence on McFadden's part such as would work a forfeiture of his rights. The burden to prove McFadden's lack of diligent mining was upon appellants (*Eckel v. Eiswerth,* 371 Pa. 490, 92 A. 2d 174), and the record indicates a failure to sustain this burden. Even had this burden been sustained, the forum chosen by appellants to enforce their rights was inappropriate. A partition proceeding in equity, even if appellants had a clear title, is singularly inappropriate to enforce a forfeiture.

Decree affirmed. Costs on appellants.