Walter Estate.

Argued October 7, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*W. Walter Braham,* with him *Chris J. Mitsos,* and
*Braham and Mitsos,* for appellant.

*Kenneth M. McLure,* for appellees.

OPINION BY MR. JUSTICE JONES, April 22, 1970:

Rolla Walter (testator), a Lawrence County resi-
dent, on July 20, 1962, executed his last will; on Sep-
tember 30, 1964, he executed and delivered to a coal
company a written instrument purporting to be a "coal
lease;" he died on May 6, 1966. The issue on this ap-
peal is: what was the effect, if any, of the execution
and delivery of the "coal lease" on a specific devise con-
tained in testator's will of testator's "farm," overlying
the "leased" coal?

Under his will, testator gave his sister, Ivonette
Walter, "for and during her natural life all income and
net profit from [his] estate" (Paragraph 2); testator
then provided that upon Ivonette Walter's death: "I
give and devise my farm in Mahoning Township, Law-
rence County, Pennsylvania, on which I now reside to
my niece, Lucille Ruehle and to Stewart Ruehle [Lu-
cille Ruehle's son] share and share alike" (Paragraph
3); testator then gave pecuniary legacies to two
churches (Paragraph 4); testator then bequeathed,
"[s]ubject to the bequests and devises hereinbefore
stated," pecuniary legacies, ranging from $500 to $2,-
000, to twelve nephews and nieces and a cemetery, and

then stated that ". . . Whatsoever shall remain of my estate, after the devises and bequests hereinbefore contained, I direct to be divided pro-rata among the legatees in this . . . paragraph, in proportion to the above bequests." (Paragraph 5) Lastly, testator directed payment of transfer and other taxes out of the residuary estate.

Testator's sister, Ivonette Walter, predeceased him.

The so-called "coal lease"—executed two years after the will—recited that testator, as lessor, "leases, lets and demises" to the Ambrosia Coal and Construction Company (Coal Company) "[a]ll of the profitable and marketable seam or vein of coal in, under and upon" a fifty-five acre tract of land in Mahoning Township, Lawrence County (testator's "farm"), "[t]ogether with all the mining rights and easements owned by [testator] and appurtenant to the coal and land herein described, including the right of ingress, egress and regress in, to and upon said land for the purpose of exploring for and mining and preparing said coal for market, to deposit waste material and refuse on the surface of the land, to drain water upon the surface by any means, to transport coal from other properties through or over this premises and to do all things necessary, usual and proper in connection with said operations" with the lessor (testator) releasing all liability for damages to buildings and objects on the surface of the land. The "lease" further provided mining could be by any method whatsoever, i.e., deep or strip mining, and granted the right of depositing all the overburden on the land itself. The coal company was to pay to testator "the sum or price of thirty (30¢) cents per ton of two thousand pounds for all profitably minable, merchantable and marketable coal mined and removed from said premises," such payments to be made on a monthly basis.

548

The nub of this controversy[1] is whether the royalties from the "coal lease," after testator's death, are distributable and payable to the farm devisees or the residuary legatees. The Orphans' Court of Lawrence County determined the coal royalties were payable to the residuary legatees and not to the farm devisees.

In order to clarify, briefly, the procedural features of this litigation, it should be noted that a corporate fiduciary (as administrator d.b.n.c.t.a.) filed its account with a schedule of distribution which proposed distribution of the coal royalties to the residuary legatees, that the farm devisees excepted to this schedule of distribution and asked for a hearing to present evidence to aid in construction of the will, that the court below refused this request and later refused to reconsider its denial of this request, that, after argument, the court dismissed the exceptions and confirmed the account *nisi* and then, after argument before the court en banc, confirmed the account finally. From the latter decree the instant appeal was taken.

The argument of the farm devisees that the coal royalties belong to them is severalfold: (1) bearing in mind that an absolute gift by a testator is not to be cut down by later provisions in the will, that the gifts to the residuary legatees were made "subject to" the devise to the farm devisees and that, while a will speaks as of the date of death, the testator's intentions are to be ascertained as of the date of execution of the will,[2] the terms of the instant will disclose an intent to give the farm devisees title not only to the farm but also the coal royalties; (2) that the so-called "lease" was

---

[1] This is a controversy between the niece and grandnephew, devisees of the farm tract wherein is the coal which is the subject of the "coal lease," and the residuary legatees under the will.

[2] To show the circumstances attendant at the time of execution of the will, the farm devisees sought to introduce parol evidence.

not a conveyance of the coal in place and testator retained an interest in the coal until his death; (3) that the "coal lease" did not impliedly revoke the devise of the farm contained in the will.

The residuary legatees argue: (1) the will is free from any ambiguity and, therefore, parol evidence was not admissible to show intent; (2) that the "lease" constituted a sale of the coal in place; (3) that the will itself does not purport to give to the farm devisees an estate in personalty, *i.e.,* the right to receive coal royalties, which was nonexistent when the will was made.

Initially, we consider the effect of the so-called "lease" between testator and the coal company. Whether this agreement is a lease or a sale of the coal in place depends upon the language of the instrument viewed in the light of our case law. See: *Hummel v. McFadden,* 395 Pa. 543, 555, 150 A. 2d 856, 861 (1959), and authorities therein cited. The fact that the instrument is termed a "lease" is neither controlling nor determinative of the nature of the instrument. Under the terms of the instrument, testator leased to the coal company "[a]ll of the profitable and marketable seam or vein of coal in, under and upon" all of the fifty-five acre tract which was known to testator as his "farm." As has been pointed out, this instrument provided that the taking of the coal could be by any method, a provision which empowered and authorized the coal company not only to deep mine but to strip mine the tract. Our examination of this instrument convinces us that testator, under the provisions of this instrument, effected a sale of all the coal in place and substituted testator's right to the mineral estate for the royalties provided under the agreement. After execution and delivery of the agreement, testator had but two things left insofar as the mineral estate was concerned: the right to receive the stipulated royalties and a possibili-

550

ty of reverter. See: *Hummel v. McFadden,* 395 Pa. 543, 150 A. 2d 856 (1959), and authorities therein cited.[3] Therefore, *at the time of his death,* testator had the right to pass on, by way of inheritance, the right to receive royalties and the possibility of a reversion in the future. Under our conclusion that the agreement effected a sale of the coal in place, we must next determine what effect this sale of the mineral rights had upon the specific devise of testator's "farm" contained in Paragraph 3 of the will.

The rationale of the court below is that our case law, represented principally by *Smith v. Glen Alden Coal Co.,* 347 Pa. 290, 32 A. 2d 227 (1943), and *Hummel v. McFadden,* 395 Pa. 543, 150 A. 2d 856 (1959), requires a determination that the so-called "coal lease" was, in effect, a sale of the coal in place and that the royalties payable under the "lease" were personalty which passed to the residuary legatees.[4]

It is not without difficulty[5] that we arrive at the result reached by the court below. A careful examina-

---

[3] See distinction between a "reversion" and a "possibility of reverter" drawn in *Copenhaver v. Pendleton,* 155 Va. 463, 155 S.E. 802 (1930).

[4] It should be noted that the court below, in its Opinion No. 2, stated that the "coal lease" severed the coal from the real estate, "with the result that the coal, and the income produced thereby, became personal property passing under the residue clause of the will." Insofar as the coal is concerned, the coal certainly did not become personalty and did not pass under the residuary clause.

[5] We say "not without difficulty" because the language of the will—apparently not drawn by a layman—appears to render clear that testator intended, when he made his will, to prefer the Ruehles. It is obvious that the primary object of testator's bounty was his sister and, during her lifetime, she was to receive "all income and net profit" from the estate. Only upon the sister's death was any further disposition of the estate to take place. The next favorite objects of testator's bounty were to be his niece and her son, to whom testator gave, by way of a specific devise, his "farm;" a "Christian" church to which he gave a pecuniary legacy; and

tion of the instant "lease" of the coal, viewed in the light of our case law, demonstrates that the so-called "lease" amounted to a *sale* of the coal in place. By this "lease," testator terminated his ownership of the mineral estate and received therefor a right to royalties from the coal when mined and removed from the premises. Indeed, the so-called "lease" went even further in that it permitted not only deep but strip mining, thus allowing the so-called "lease" to damage the surface and destroy its utility. As appellants well argue, the advent of strip mining has created an entirely novel situation. Unlike ordinary-type mining, utilization of the method of strip mining destroys for all practical purposes the surface of the land overlying the coal. The removal

---

a Presbyterian church to which he gave, in trust, a pecuniary legacy. The residuary legatees argue that the phrase "Subject to the bequests and devises hereinbefore stated," *i.e.*, the gifts to the sister, the niece and her son and the two churches, was employed by testator only to define the residuary estate or, at the most, to establish priority rather than preference. In our view, such argument is without merit. "*Subject to*" means "subordinate, subservient, inferior." *Black's Law Dictionary* 1594 (1968). See also: *Hammond's Estate*, 197 Pa. 119, 122-123, 46 A. 935 (1900). We read the phrase "Subject to," etc., as indicative of a clear testamentary intent that the twelve nephews and nieces were to be the recipients of the specified pecuniary bequests only after the devise to the niece and her son and the legacies to the two churches had been taken care of, and clearly indicated a *preference* among the objects of testator's bounty. Any possible doubt that a *preference* was intended is resolved by the language of the residuary clause which is prefaced by the phrase "[w']hatsoever shall remain of my estate, *after the devises and bequests hereinbefore contained* . . . ." (Emphasis added) The language of the will clearly spells out a preference for the niece and her son over those objects of testator's bounty contained in the latter part of the will. If such was the intent of the testator—and we so conclude—the result of the decree of the court below defeats such intent and places the residuary legatees, rather than the specific devisees, in a preferential position.

of the overburden by strip mining in order to reach and secure the coal underneath the surface destroys and renders, particularly for agricultural purposes, the surface useless. The instant coal lease permits both deep and strip mining. Unfortunately for the farm devisees (appellants), the testator alienated by the "lease" much of that which he had previously given them.

*Smith, supra,* clearly enunciates the principle that the right to receive the coal royalties is personalty, not realty; in fact, in *Smith, supra,* the Court awarded the purchase price for the right to receive coal royalties to deceased "lessor's" personal representative rather than his heirs.

Appellants complain of the refusal of the court below to permit the introduction of parol evidence to show the circumstances which existed when the will was made. We detect no such ambiguity in this will which would permit the reception of such evidence. Even though such evidence were admissible, it could indicate no more than that which we find to have been testator's intent when he made the will, *i.e.,* that testator "preferred" the Ruehles in his will and wanted them to become the owners of his "farm." However, by his post-testamentary action in executing the so-called "lease," he removed from the orbit of his ownership the "mineral estate" under the farm and thus deprived appellants not only of such ownership but of the "fruits" of the farm.

Even though the testator may not have appreciated the impact of his actions in executing the coal "lease" on his prior testamentary "devise" of the farm to the Ruehles, our case law on coal leases requires our present ruling. Such case law has established a rule of property law, long adhered to and relied upon, a rule which should not now be altered.

In short, what testator intended, initially, by way of disposition of his "farm" was thwarted and defeated by his own action in the execution of the "coal lease."

Decree affirmed. Each party to bear own costs.